IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 12-cv-02514-RBJ-MEH
DENISE N. AXELROD (f/k/a Denise Traynom), and
BRANDON K. AXELROD,
Plaintiffs,
v.
CINEMARK HOLDINGS, INC.,
CINEMARK USA, INC., and
CENTURY THEATERS, INC.,
Defendants.
_____

Civil Action No. 12-cv-02517-RBJ-MEH
JOSHUA R. NOWLAN,
Plaintiffs,
v.
CINEMARK HOLDINGS, INC.,
CINEMARK USA, INC., and
CENTURY THEATERS, INC.,
Defendants.
_____

Civil Action No. 12-cv-02687-RBJ-MEH
DION ROSBOROUGH,
RYAN LUMBA,
TONY BRISCOE,
JON BOIK, next friend of Alexander Boik,
LOUIS DURAN,
SHIRLEY CLARK,
MARY THERESA HOOVER,
EVAN FARIS, and
RICHELE HILL,
Plaintiffs,
v.
CINEMARK HOLDINGS, INC.,
CINEMARK USA, INC., and
CENTURY THEATERS, INC.,
Defendants.
_____

Civil Action No. 12-cv-02704-RBJ-MEH
JERRI JACKSON,
Plaintiff,

v.
CINEMARK HOLDINGS, INC.,
CINEMARK USA, INC., and
CENTURY THEATERS, INC.,
Defendants.
_____

Civil Action No. 12-cv-02705-RBJ-MEH
GREGORY MEDEK, and
RENA MEDEK,
Plaintiffs,
v.
CINEMARK HOLDINGS, INC.,
CINEMARK USA, INC., and
CENTURY THEATERS, INC.,
Defendants.
_____

Civil Action No. 12-cv-02900-RBJ-MEH
IAN SULLIVAN,
Plaintiffs,
v.
CINEMARK HOLDINGS, INC.,
CINEMARK USA, INC., and
CENTURY THEATERS, INC.,
Defendants.
_____

Civil Action No. 13-cv-00045-RBJ-MEH
CHICHI SPRUEL and
DERICK SPRUEL,
Plaintiffs,
v.
CINEMARK HOLDINGS, INC.,
CINEMARK USA, INC., and
CENTURY THEATERS, INC.,
Defendants.
_____

Civil Action No. 13-cv-00046-RBJ-MEH
MUNIRIH F. GRAVELLY,
Plaintiff,
v.
CINEMARK HOLDINGS, INC.,
CINEMARK USA, INC., and
CENTURY THEATERS, INC.,

Defendants.
_____

Civil Action No. 13-cv-00114-RBJ-MEH
LYNN JOHNSON,
MACHAEL SWEENEY,
MALIK SWEENEY by and through his parents and next friends of Machael Sweeney and Lynn Johnson,
MALACHI SWEENEY, and
MACHI SWEENEY,
Plaintiffs,
v.
CENTURY THEATERS, INC.,
Defendant.
_____

Civil Action No. 13-cv-01842-RBJ-MEH
ZACKARY GOLDITCH,
Plaintiff,
v.
CINEMARK HOLDINGS, INC.,
CINEMARK USA, INC., and
CENTURY THEATERS, INC.,
Defendants.
_____

Civil Action No. 13-cv-01995-RBJ-MEH
ASHLEY MOSER,
Plaintiff,
v.
CINEMARK HOLDINGS, INC.,
CINEMARK USA, INC., and
CENTURY THEATERS, INC.,
Defendants.
_____

Civil Action No. 13-cv-02060-RBJ-MEH
JARELL N. BROOKS,
Plaintiff,
v.
CINEMARK HOLDINGS, INC.,
CINEMARK USA, INC., and
CENTURY THEATERS, INC.,
Defendants.
_____

Civil Action No. 13-cv-02239-RBJ-MEH
KATHLEEN LARIMER, and
SCOTT LARIMER
Plaintiffs,
v.
CINEMARK HOLDINGS, INC.,
CINEMARK USA, INC., and
CENTURY THEATERS, INC.,
Defendants.

_____

Civil Action No. 13-cv-02988-RBJ-MEH
NICK GALLUP,
Plaintiff,
v.
CINEMARK HOLDINGS, INC.,
CINEMARK USA, INC., and
CENTURY THEATERS, INC.,
Defendants.

_____

Civil Action No. 13-cv-02992-RBJ-MEH
BROOKE COWDEN,
KRISTIAN COWDEN, and
WESTON COWDEN,
Plaintiffs,
v.
CINEMARK HOLDINGS, INC.,
CINEMARK USA, INC., and
CENTURY THEATERS, INC.,
Defendants.

_____

Civil Action No. 13-cv-03316-RBJ-MEH
STEFAN MOTON,
Plaintiff,
v.
CINEMARK HOLDINGS, INC.,
CINEMARK USA, INC., and
CENTURY THEATERS, INC.,
Defendants.

_____

Civil Action No. 14-cv-01729-RBJ-MEH
ALLEEN YOUNG,

4

Plaintiff,
v.
CINEMARK HOLDINGS, INC.,
CINEMARK USA, INC., and
CENTURY THEATERS, INC.,
Defendants.
_____

Civil Action No. 14-cv-01923-RBJ-MEH
CHANTEL L. BLUNK,
MAXIMUS T. BLUNK, and
HAILEY M. BLUNK,
Plaintiffs,
v.
CINEMARK HOLDINGS, INC.,
CINEMARK USA, INC., and
CENTURY THEATERS, INC.,
Defendants.
_____

Civil Action No. 14-cv-01976-RBJ-MEH
JAMISON TOEWS,
Plaintiff,
v.
CINEMARK HOLDINGS, INC.,
CINEMARK USA, INC., and
CENTURY THEATERS, INC.,
Defendants.
_____

Civil Action No. 14-cv-01986-RBJ-MEH
MARCUS WEAVER,
Plaintiff,
v.
CENTURY THEATERS, INC.,
CINEMARK, USA, INC., AND
CINEMARK HOLDINGS, INC.
Defendants.
_____

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

5

These cases, which have been consolidated for purposes of discovery and motions practice,[1] are before the Court on a motion for summary judgment filed by the defendants Cinemark Holdings, Cinemark USA, and Century Theaters. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1332. For the following reasons, the motion is denied.

## BACKGROUND

These cases arise from the shootings that occurred at the Century Aurora 16 theater complex in Aurora, Colorado on July 20, 2012. James Holmes purchased a ticket for the midnight premiere showing of The Dark Knight Rises and took a seat in Auditorium 9. During the previews he left the auditorium through the exit door to the outside, leaving it propped open with a plastic clip. He went to his car, which he had parked immediately behind the auditorium, donned body armor and a gas mask, and armed himself with a tear gas canister, a shotgun, a rifle, at least one handgun, and extra ammunition. Twenty minutes after the movie started Holmes reentered the auditorium through the exit door, disbursed tear gas, and began randomly shooting patrons. After killing 12 individuals and wounding many others, Holmes returned to his car, again through the exit door, and waited there until he was arrested by police.

The plaintiffs in the present cases are people who were injured and survivors of those who were killed. The lawsuits were initially filed only against Century Theatres, Inc., but based on facts that have been learned during pretrial discovery, all but one of the complaints have been amended to join Cinemark Holdings, Inc. and Cinemark USA, Inc. as additional defendants. Cinemark, USA and Century Theatres, Inc. are wholly owned subsidiaries of Cinemark Holdings, Inc., and I will refer to them collectively as "Cinemark" or "defendants."

---

[1] The cases have been consolidated such that all filings can be found in the docket for the lowest numbered (and earliest filed) case: 12-cv-02514-RBJ-MEH. All references to docket numbers are references to 12-cv-02514-RBJ-MEH.

6

Plaintiffs' contention is that the injuries and deaths could have been prevented had the defendants taken reasonable steps to provide security for the theater on that evening. Defendants' response is that the shootings, which were carefully planned and carried out, were so unprecedented as to be legally unforeseeable. The ultimate question posed by the pending motion is whether the dispute should be dismissed by the Court as a matter of law or should be resolved by a jury trial.

This is not the first time in the case that this question has been presented to me. Early on the defendants filed a motion to dismiss the case on the legal ground that the complaints failed to state a claim on which relief could be granted. On April 17, 2013 the Court, agreeing with a recommendation by United States Magistrate Judge Michael E. Hegarty, denied that motion. At that stage of the case the Court was required to accept the plaintiffs' allegations of fact as true, and having done so, I determined that the plaintiffs had alleged enough to avoid immediate dismissal. Since that time the parties, primarily the plaintiffs, have conducted extensive pre-trial discovery in an effort to develop more information about what the defendants knew about security risks and when they knew it. The defendants contend that the plaintiffs did not uncover any facts that create enough of a dispute that a trial is required and now seek summary judgment dismissing the case.

**SUMMARY JUDGMENT STANDARD**

The purpose of a trial, whether by the court or a jury, is to resolve disputed issues of fact. Summary judgment simply means that the Court can decide the case, for either party, if there is no genuine dispute of fact that needs to be resolved at a trial. "Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law.'" *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)).

When deciding a motion for summary judgment, the Court considers "the factual record, together with all reasonable inferences derived therefrom, in the light most favorable to the non-moving party . . . ." *Id.* The moving party has the burden of producing evidence showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In challenging such a showing, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## ANALYSIS

In denying the defendants' motion to dismiss, this Court held that Cinemark's liability, if any, would be determined under Colorado's Premises Liability Act. This statute sets the standard for the possible liability of a "landowner" when someone is injured on his property "by reason of the condition of such property, or activities conducted or circumstances existing on the property." C.R.S. § 13-21-115(2). Courts determine, as a matter of law, whether the injured person was a trespasser, a licensee, or an invitee. Patrons of a movie theater are indisputably invitees. At least one of the defendant entities is a landowner, and for present purposes I assume that Cinemark collectively is a landowner. "[A]n invitee may recover for damages caused by a landowner's unreasonable failure to exercise reasonable care to protect against dangers of which he *actually knew or should have known*." C.R.S. § 13-21-115(3)(c)(I) (emphasis added).

Although the briefing of the motion for summary judgment has been extensive, the sole question posed by the motion can be stated simply: is there a genuine dispute of fact as to whether Cinemark knew or should have known of the danger faced by the patrons in Auditorium 9 on July 20, 2012? I discussed the relevant danger in my order denying the defendants' motion to dismiss:

> Rather, it seems to me, the danger inherent in the construction and operation of this theater was that it allowed someone inside the theater surreptitiously to prop the door leading directly from the theater to the outside open and thereby to permit himself or others to enter the theater undetected and to commit a violent act against one or more patrons inside. The questions then become, (1) did Cinemark know or should it have known that this danger existed, and, if so, (2) did it exercise reasonable care to protect patrons against this danger.

April 17, 2013 Order, ECF No. 49 at 9.

Defendants' motion for summary judgment argues that the Court should decide that Cinemark neither knew nor should have known of this danger because the danger was unforeseeable as a matter of law. The problem is, whether a landowner should have known of a particular danger generally is a question of fact, not law. *See Vigil v. Franklin,* 103 P.3d 322, 326 (Colo. 2004) ("Whether an injured plaintiff is a trespasser, licensee, or invitee must be decided by the court, but the ultimate issues of liability and damages are questions of fact for a jury, or if none, for the trial judge."). Thus, in Colorado's standard jury instruction concerning the potential "liability of owner or occupant to an invitee injured on premises," the second element for the jury to consider is whether "[t]he defendant actually knew about a danger on the property or as a person using reasonable care, should have known about it." Colorado Jury Instructions – Civil § 12:3 (2014 ed.).

Even so, a court could find a danger to be so unprecedented and remote that, as a matter of law, no rational juror could find that a landowner should have known about it. In both its

9

motion to dismiss and its motion for summary judgment Cinemark cites as an example *Lopez v. McDonald's Corp.*, 193 Cal. App. 3d 495 (Cal. Ct. App. 1987). In 1984 James Huberty walked into a McDonald's restaurant in San Ysidro, California armed with a rifle, a handgun, and a shotgun and indiscriminately shot patrons and employees, ultimately leaving 21 persons dead and 11 others injured. Survivors and surviving family members sued McDonalds, arguing that the restaurant was in a high-crime area; that it had considered but ultimately declined to retain a private security company; and that McDonalds should be liable on theories of negligence and premises liability. McDonalds countered that, as a matter of law, the incident was so unlikely as to fall outside the boundaries of a restaurant's general duty to protect patrons from reasonably foreseeable criminal acts. The court agreed with McDonald's that its general duty to its patrons did not include protection against a "once-in-a-lifetime" massacre. *Id.* at 441. In affirming the trial court's grant of summary judgment, the Court of Appeal summarized its thinking as follows:

> [W]e conclude as a matter of law the *Rowland* [*v. Christian*, 70 Cal. Rptr. 97 (1968),] factors and specifically the unforeseeability of the unique, horrific San Ysidro event require negligence liability to be restricted here. First, as to the foreseeability of harm to plaintiffs, the theft-related and property crimes of the type shown by the history of its operations, or the general assaultive-type activity which had occurred in the vicinity bear no relationship to purposeful homicide or assassination. In other words, under all the circumstances presented, the risk of a maniacal, mass murderous assault is not a hazard the likelihood of which makes McDonalds's conduct unreasonably dangerous. Rather, the likelihood of this unprecedented murderous assault was so remote and unexpected that, as a matter of law, the general character of McDonald's nonfeasance did not facilitate its happening. Huberty's deranged and motiveless attack, apparently the worst mass killing by a single assailant in recent American history, is so unlikely to occur within the setting of modern life that a reasonably prudent business enterprise would not consider its occurrence in attempting to satisfy its general obligation to protect business invitees from reasonably foreseeable criminal conduct.

*Id.* at 509–10.

I do not disagree at all with the holding in the *Lopez* case. But what was "so unlikely to occur within the setting of modern life" as to be unforeseeable in 1984 was not necessarily so unlikely by 2012. Cinemark itself acknowledges in its reply brief some of the grim history of mass shootings and killings that have occurred in more recent times. ECF No. 175 at 11. The school shootings at the University of Texas in 1966, Columbine High School in 1999, and Virginia Tech in 2007 are just a few of the most highly publicized incidents. If one Googles "mass shooting incidents" one finds dozens of lists of the major incidents. For example, an article by the staff of the *Los Angeles Times* published on April 2, 2014 lists 31 mass shooting incidents between the San Ysidro McDonald's disaster and the Aurora shootings. *Deadliest U.S. mass shootings*, L.A. TIMES, Apr. 2, 2014, *available at* http://timelines.latimes.com/deadliest-shooting-rampages/. These incidents occurred in schools, businesses, military bases, shopping malls, a supermarket, on a train, in an immigration center and, as we now know, in a theater.

Does this necessarily mean that Cinemark should have known of the danger to its patrons on July 20, 2012? No. Discovery in this case has uncovered no instance of a mass shooting in a movie theater before the Aurora incident (this is hardly surprising; if there had been such an incident, we almost certainly would have heard of it). Nor have the plaintiffs discovered any instance of an assailant's entering a theater auditorium through a surreptitiously propped open exit door and committing a violent act against someone watching the movie. That, argue the defendants' attorneys, is all the Court needs to grant summary judgment in Cinemark's favor. Being good advocates, they cite this Court's order denying their motion to dismiss in support of that conclusion.[2] Specifically, they cite the following paragraph in the April 17 order:

---

[2] I say "good advocates" because their briefs were well reasoned, well researched, and well written. They would be more impressive, however, if jabs at plaintiffs' counsel were omitted from future filings.

> The first of those questions [(did Cinemark known or should it have known of the danger)] involves what Cinemark knew had happened in the past at this theater and what Cinemark generally knew or should have known about dangers faced by similar theaters. *Had there been instances where individuals had entered Cinemark theaters or other theaters surreptitiously through doors leading directly from a theater auditorium to the outside – not to "sneak in" to avoid the ticket price, but to commit a violent act? Was this a phenomenon that was known or should have been known to Cinemark based on its knowledge of the theater industry?* This is where "foreseeability" comes in. As indicated above, the foreseeability and likelihood of injury have historically been considered by Colorado courts in determining whether a landowner owed a duty – a judicial task mooted by the Premises Liability Act. However, foreseeability is inherent in the determination of whether a landowner "should have known" that a particular danger existed.

ECF No. 49 at 9–10 (emphasis added).

Thus, Steve Zuehlke, Senior Vice President of Cinemark USA, Inc., states in his affidavit (obviously prepared by counsel) that "[a]t no time on or before July 20, 2012 did Cinemark or Century know of instances where individuals had entered Cinemark theatres, Century theatres, or other theatres surreptitiously through doors leading directly from a theatre auditorium to the outside – not to 'sneak in' to avoid the ticket price, but to commit a violent act." ECF No. 108-2 at ¶ 17. The affidavit of John Fithian, President and Chief Executive Officer of the National Association of Theatre Owners, in nearly identical language states, "At no time on or before July 20, 2012 did NATO know of instances where individuals had entered Cinemark theatres, Century theatres, or other theatres surreptitiously through doors leading directly from a theatre auditorium to the outside – not to 'sneak in' to avoid the ticket price, but to commit a violent act." ECF No. 108-3 at ¶ 10.

However, I did not intend to hold that nothing short of a previous similar act in another theater could possibly support the existence of a genuine dispute of fact. Suppose, for example, Cinemark had been specifically warned that someone was planning such an incident at one of its theaters – that presumably would have made such an incident "foreseeable." Or, suppose that a

memo in Cinemark's records expressly acknowledged this risk. There is no evidence of such a warning or internal memo, but the point is that one must look at all the relevant facts, not just whether there had ever been a similar incident in a theater.

In that regard the Colorado Supreme Court's decision in *Taco Bell, Inc. v. Lannon*, 744 P.2d 43 (Colo. 1987) is worth recalling. That case involved the denial of a motion to dismiss, not a motion for summary judgment, and the Court was addressing whether a duty of care existed under common law predating the Premises Liability Act. Nevertheless, I note the following comments concerning the foreseeability of a risk to individuals on a landowner's property:

> To establish that an incident is foreseeable, it is not necessary that an owner or occupier of land held open for business purposes be able to ascertain precisely when or how an incident will occur. Rather, foreseeability includes whatever is likely enough *in the setting of modern life* that a reasonably thoughtful person would take account of it in guiding practical conduct. . . . Simply because something has not yet happened does not mean that its happening is not foreseeable. Instead, foreseeability is based on common sense perceptions of the risks created by various conditions and circumstances.

*Id.* at 48 (emphasis added, internal quotation marks omitted, and internal citation omitted).

One such relevant fact in the setting of modern life is simply the changed landscape in which any school or base or business where large numbers of people congregate operated in July 2012. Although theaters had theretofore been spared a mass shooting incident, the patrons of a movie theater are, perhaps even more than students in a school or shoppers in a mall, "sitting ducks." One might reasonably believe that a mass shooting incident in a theater was likely enough (that is, not just a possibility) to be a foreseeable next step in the history of such acts by deranged individuals.

Plaintiffs have also come forward with some evidence suggesting that the risk of an "active shooter" incident in a theater was not unknown to Cinemark.  In 2009 Cinemark engaged a Texas security firm, Coulson Jackson and Associates, to evaluate its security program.  It is only fair to acknowledge that the engagement was motivated by concern that crime by drug cartels at or near the border between the United States and Mexico could spill into Cinemark theaters in border towns, not by a more universal concern about potential mass shootings in theaters located elsewhere.  It is also fair, however, to note that the experts recommended that "active shooter" procedures be developed.  June 25, 2009 Report, ECF No. 156-21, at 3–4 (Report pages 7–8).  "Active Shooter" was defined in the report as "an attack, generally in a public facility, on groups or individuals by one or more armed persons."  ECF No. 156-23. Plaintiffs cite a snippet from an email of Danny Myers, Director of Global Loss Prevention for Cinemark USA, stating, "I think this type of training would benefit all of our managers."  ECF No. 156-24.  This quote appears to have been taken out of context, as the complete email suggests that Mr. Myers was probably referring to all managers of border theaters.  *See* Bates Aff., ECF No. 156-35 at ¶ 16d.  Nevertheless, the documents show that Cinemark's management was aware that "active shooter" incidents could happen in theaters.

Plaintiffs have engaged a security consultant as an expert witness.  This individual's affidavit largely duplicates the facts offered by the plaintiffs in support of their opposition to the motion to dismiss, and I find many of the facts to be irrelevant to the question before me.  He does, however, list several violent crimes that reportedly occurred in Cinemark theaters and in other theaters before the Aurora incident.  Bates Aff., ECF No. 156-35 at ¶ 12.
It is not clear from the report whether Cinemark was aware of the incidents other than those that occurred in its theaters.  For example, was Cinemark aware of the incident that allegedly

occurred in a Loews theater in 2006 where an apparently despondent patron stood up in the rear of a theater auditorium and began randomly to fire a handgun, later explaining that he was mad "because of the way things are going in my life"? *Id.* at ¶ 12h. Mr. Bates seems to indicate that his sources of the information in his paragraph 12 were provided in an "Attachment E" to his report entitled "Incident Reports-Nationally." I could not find such an attachment and therefore cannot comment on whether this is information of which Cinemark was likely aware through its membership in the National Association of Theater Owners or otherwise.[3]

But the plaintiffs have also cited nine reported court cases involving shootings in theaters or theater complexes prior to 2012. Certain Plaintiffs' Response to Defendants' Motion for Summary Judgment, ECF No. 156 (hereinafter "Response Br.") at 38–39. None of these cases involved anything on the scale of the Aurora shootings, but the point is that violent crimes in theaters, including shooting incidents, were not unheard of.

Plaintiffs also note that 80 of Cinemark's approximately 300 theaters did engage off-duty policemen or other security personnel to patrol their theaters for the midnight premiere of The Dark Knight Rises. The decision whether to hire extra security was apparently left to the managers of the local theaters. The manager of the Aurora theater complex explained that he did not believe extra security was necessary due to the nature of the movie and the type of crowd he expected. Crowdes Depo., ECF No. 157-14, at 116. I am not necessarily faulting that local decision (although Batman movies do include violence), but the fact that approximately 25% of Cinemark's theaters were concerned enough to hire extra security is part of the totality of what Cinemark presumably knew or should have known at the time.

---

[3] The Fithian Affidavit submitted by the defendants indicates that the National Association of Theater Owners, of which Cinemark is a member, tracks news reports related to theater security and circulates those reports to members as appropriate. ECF No. 108-3 at ¶ 9.

Finally Plaintiffs point to a "Roll Call Release" issued by the United States Department of Homeland Security to Cinemark and other theater chains on May 17, 2012 entitled "Terrorists' Interest in Attacking Theaters and Similar Mass Gatherings." ECF No. 156-31. This warning notified the theaters of two incidents of concern: an April 4, 2012 suicide bombing of the National Theater in Mogadishu, Somalia during a speech by the Somali prime minister; and a communication from an al-Qa'ida-linked extremist advocating attacks on U.S. theaters. *Id.* The document states, "[a]though we have no specific or credible information indicating that terrorists plan to attack theaters in the United States, terrorists may seek to emulate overseas attacks on theaters here in the United States because they have the potential to inflict mass casualties and cause local economic damage." It concludes, "[t]hese recent instances demonstrate that mass gatherings such as those associated with theaters likely remain attractive terrorist targets. We encourage facility owners and operators, security personnel, and first responders to remain vigilant and report suspicious activities and behaviors that may indicate a potential attack." *Id.* The Holmes incident had nothing to do with international terrorism. But the warning about attacks on theaters is part of the picture of what Cinemark knew. The warning was also consistent with Cinemark's "Parking Lot Safety" policy in effect in July 2012 that directed employees to "[n]ote anyone near restricted areas or rear doors." ECF No. 156-6.

None of these facts, even when taken together, compels the conclusion that Cinemark knew or should have known of the danger that the patrons of Auditorium 9 faced. I reiterate that this Court is in no way holding as a matter of law that Cinemark should have known of the danger of someone entering one of its theaters through the back door and randomly shooting innocent patrons. I hold only that a court cannot grant summary judgment on what is normally a question of fact under Colorado law unless the facts so overwhelmingly and inarguably point in

Cinemark's favor that it cannot be said that a reasonable jury could possibly side with the plaintiffs on that question. I am not convinced. Plaintiffs have come forward with enough – and it does not have to be more than just enough – to show that there is a genuine dispute of material fact. A genuine fact dispute must be resolved by the trier of fact, not by a court's granting summary judgment. Whether the jury will resolve this issue in the plaintiffs' favor is a different matter entirely.

Of course, even if the plaintiffs can jump this hurdle, they ultimately will face others that were not presented in the defendants' motion for summary judgment. For example, what should a reasonable theater have done before July 20, 2012 even if it recognized that "it could happen to us"?[4] And, would any reasonable preventative measure or combination of measures have stopped Holmes? As the plaintiffs' response acknowledges, Holmes' assault was hardly a random event. It was carefully planned and executed. But these are questions for another day. The Court today only addresses the issue presented by the pending motion.

## ORDER

The motion for summary judgment, ECF No. 108, is denied.

DATED this 15th day of August, 2014.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge

---

[4] The problem is illustrated by the example of schools. What do we reasonably expect a school to do even now when we know that school shootings have become a repeated phenomenon? Plaintiffs have acknowledged that Cinemark had various security-oriented policies and procedures in effect in July 2012, both nationally and locally. *See, e.g.*, Response Br. at 17–20. Whether Cinemark reasonably could be expected to have implemented any specific additional security measure in light of what was known at the time and the realities of the theater business is not an easy question to answer.