```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2

     Civil Action No. 12-cv-02514-RBJ-MEH
 3

     DENISE N. AXELROD, et al.;
 4   JOSHUA R. NOWLAN, (12-CV-02517-RBJ-MEH);
     DION ROSBOROUGH, et al., (12-cv-02687-RBJ-MEH);
 5   JERRI JACKSON, (12-cv-02704-RBJ-MEH);
     GREGORY MEDEK, et al., (12-cv-02705-RBJ-MEH);
 6   IAN SULLIVAN, (12-cv-02900-RBJ-MEH);
     CHICHISPRUEL, et al., (13-cv-00045-RBJ-MEH);
 7   MUNIRIH F. GRAVELLY, (13-cv-00046-RBJ-MEH);
     MACHAEL SWEENEY, et al., (13-cv-00114-RBJ-MEH);
 8   ZACKARY GOLDITCH, (13-cv-01842-RBJ-MEH);
     ASHLEY MOSER, (13-cv-01995-RBJ-MEH);
 9   JARELL N. BROOKS, (13-cv-02060-RBJ-MEH);
     KATHLEEN LARIMER, et al., (13-cv-02239-RBJ-MEH)
10   NICK GALLUP, (13-cv-02988-RBJ-MEH);
     BROOKE COWDEN, et al., (13-cv-02992-RBJ-MEH);
11   STEFAN MOTON, (13-cv-03316-RBJ-MEH);
     ALLEEN YOUNG, (14-cv-01729-RBJ-MEH);
12   CHANTEL L. BLUNK, et al., (14-cv-01923-RBJ-MEH);
     JAMISON TOEWS, (14-cv-01974-RBJ-MEH);
13   MARCUS WEAVER, (14-cv-01986-RBJ-MEH);

14        Plaintiffs,

15   vs.

16   CINEMARK HOLDINGS, INC., et al.,

17        Defendants.

18   _____

19
                         REPORTER'S TRANSCRIPT
20                         Status Conference

21   _____

22

23

24   Proceeding Reported by Mechanical Stenography, Transcription
            Produced via Computer by Kara Spitler, RMR, CRR,
25         901 19th Street, Denver, CO, 80294, (303) 623-3080
```

1            Proceedings before the HONORABLE R. BROOKE

2   JACKSON, Judge, United States District Court for the District

3   of Colorado, commencing at 3:59 p.m., on the 14th day of

4   October, 2014, in Courtroom A902, Alfred A. Arraj United States

5   Courthouse, Denver, Colorado.

6

7                           APPEARANCES
         CHRISTINA HABAS,  Keating Wagner Polidori & Free,

8   P.C., 1290 Broadway, Suite 600, Denver, CO 80203, for 2514 and

9   2517 plaintiffs.

10           ROBERT WILHITE and SANDRA HAGEN,  Sawaya & Miller Law

11  Firm, 1600 Ogden Street, Denver, CO 80218, for 2687 plaintiffs.

12           THOMAS TASKER,  Hillyard, Wahlberg, Kudla, Sloane &

13  Woodruff, L.L.P., 4601 DTC Boulevard, Suite 950, Denver, CO

14  80237, for 1995 plaintiff.

15           MATTHEW LAIRD,  Bogue Paoli & Thomas, LLC, 1401 17th

16  Street, Suite 320, Denver, CO 80202, for 2060 plaintiff.

17           RICHARD STRAUSS,  Hochstadt, Straw, Strauss &

18  Silverman, P.C., 950 South Cherry Street, Suite 300, Denver, CO

19  80246, for 3316 plaintiff.

20           NICHOLUS PALMER,  Laub & Laub, 630 East Plumb Lane,

21  Reno, NV 89502, for 1923 plaintiffs.

22           ROBERT TRIGG,  Galloway Trigg, LLP, 1873 South

23  Bellaire Street, Suite 1200, Denver, CO 80222, for 1976

24  plaintiff.

25           CHRIS PARRISH and JEFFREY KELLEY, Harding &

1    Associates, P.C., 730 17th Street, Suite 650, Denver, CO 80202,

2    for 1986 plaintiff.

3                KEVIN TAYLOR, KYLE SEEDORF, and JOHN ROCHE,  Taylor

4    Anderson, LLP, 1331 17th Street, Suite 1050, Denver, CO 80202,

5    for defendants.

6                    P R O C E E D I N G S

7       (In open court at 3:59 p.m.)

8                THE COURT:  This is a continuation of the unique two

9    judges for the price of one.

10               12-cr-2514 and many other cases.

11               The first case is Denise Axelrod, *et al.*, vs.

12   Cinemark.

13               MS. HABAS:  Good afternoon, Your Honor, Christina M.

14   Habas on behalf of many of the plaintiffs.  I won't list them

15   all.

16               MR. TASKER:  Tom Tasker on behalf of Ashley Moser.

17               MR. STRAUSS:  Richard Strauss, cocounsel for Stefan

18   Moton.

19               MS. HAGEN:  Sandra Hagen and Robert Wilhite for the

20   Rosborough plaintiffs.

21               THE COURT:  I had Silverman for Moton.

22               UNIDENTIFIED INDIVIDUAL:  Andrew Silverman is one of

23   my law partners.

24               THE COURT:  Okay.

25               MS. HAGEN:  Sandra Hagen and Robert Wilhite for the

1    Rosborough plaintiffs, 2687.

2           THE COURT:  Got it.

3           MR. LAIRD:  Matthew Laird on behalf of Jarell Brooks.

4           THE COURT:  Thank you.

5           MR. TRIGG:  Good afternoon, Your Honor.  I'm Bob

6    Trigg.  I'm here for Jamison Toews, one of the late plaintiffs.

7    Should be toward the bottom of your list.

8           MR. KELLEY:  Good afternoon.  Jeff Kelley on behalf of

9    Marcus Weaver, along with Chris Parrish from the Harding

10   office.

11          THE COURT:  Thank you.

12          All right.

13          MR. TAYLOR:  Good afternoon, Your Honor.  Kevin

14   Taylor, Kyle Seedorf, and John Roche on behalf of defendants.

15          THE COURT:  Hello.

16          And Julie points out that Mr. Palmer is appearing by

17   phone.

18          MR. PALMER:  I'm here, Your Honor.

19          THE COURT:  That would be for clients Blunk.

20          MR. PALMER:  That is correct.

21          THE COURT:  All right.

22          So we have ten lawyers appearing today for the

23   plaintiffs.  But by my count, going through the filings, so far

24   22 different lawyers are representing the plaintiffs.  And we

25   have three for the defendant.

1          This is a status conference.  I asked Judge Hegarty to

2    join me because he has been your more frequent judicial

3    officer.

4          And I have a list of things that I think we need to

5    discuss.

6          At the top of the list is the trial date.  The current

7    trial date, which I believe is the second date that we have set

8    in this case, is a three-week, actually 14 trial-day period,

9    February 17 through March 6, 2015.  I read the transcript of

10   your last status conference with Judge Hegarty.  It appeared

11   from that that the defendants certainly and maybe the

12   plaintiffs as well, feel that that trial date will not work,

13   for the reason that you haven't had access to information in

14   the criminal file and won't have access to that until after

15   that case is tried.

16          I know the defendant feels that way.

17          Ms. Habas, you're nodding affirmatively.  Is that

18   telling me that you agree?

19          MS. HABAS:  I am, Your Honor.  It is always difficult

20   to speak for everyone, but I think we have a fair consensus of

21   plaintiffs' counsel that we agree, until we have access to the

22   criminal-case documents, that it would be not a good idea to go

23   forward with this trial.

24          THE COURT:  All right.

25          Don't go away.

1       I am assuming -- Mr. Taylor, you can correct me if I'm

2   wrong -- that the reason the defendant takes this position has

3   to do with their prospective effort to assign a substantial

4   portion, if not all, of the liability to the third-party absent

5   tort-feasors.

6       MR. TAYLOR:  Thank you, Your Honor.

7       The reason we believe the trial date of February 17

8   through March 6 would be highly premature is multiple.  The

9   reason you've enunciated is clearly one of them.  Our ability

10  to find out what Mr. Holmes did and put fault on him, surely.

11      However, it also goes to our fundamental right to

12  defend ourselves and obtain a fair trial on behalf of our

13  client.  And you may remember, when we first spoke, maybe

14  almost two years ago, the theater was within the control of

15  various law-enforcement agencies for ten days following the

16  incident.  We had no access to it at all.  We were precluded

17  from going into the scene.

18      They removed all manner of physical evidence.  The

19  police did.  And I don't know which one.  I don't know if it

20  was FBI, ATF, Colorado Bureau of Investigation, Aurora Police

21  Department, I don't know who did it.  Okay?  But they removed

22  all manner of physical evidence, including but not limited to

23  videotapes.

24      In addition to that, there are many other aspects of

25  the case that we feel it's important to get access to all of

1   the evidence so we can decide how to present our defense in a

2   fair and thorough manner.  Nonparty at fault designations or

3   other persons at fault is one aspect of that.  And it includes

4   Mr. Holmes.  It includes Dr. Fenton, who is the reported

5   professor at CU that had dealings with Mr. Holmes.  And I don't

6   know anything other than what you know.  I only know what I

7   read in the paper.  And I know there's a lot more to the story.

8   I can't get access to it, though.

9           So I don't want anyone to be under the impression

10  that, that the delay is appropriate in our minds merely because

11  we want to fully vet any nonparties at fault.  It's far broader

12  than that; it affects what we think is our fundamental right to

13  fairly defend our client.

14          THE COURT:  All right.

15          Well, Ms. Habas, I take it you don't disagree, at

16  least with the conclusion that he wants.

17          MS. HABAS:  Certainly the conclusion, Your Honor.  And

18  certainly we would have a different view of why, but the

19  expansive gag order in that criminal case has prohibited us

20  from speaking to many witnesses that normally we would have

21  been able to speak to, including investigating officers, first

22  responders, people such as that.  Although we were able to gain

23  certain information about the contents of Mr. Holmes'

24  cellphone, for example, and other matters before this incident

25  even occurred, it is secondhand information from the

 1    preliminary hearing transcript.  And we are not being given

 2    access to exhibits.  We are not being given access to that,

 3    either.  So for all of those reasons, we believe it would be

 4    imprudent for this case to proceed to trial until we have the

 5    ability to obtain that information.

 6         I don't know if you want an update as to the criminal

 7    case.  I do have some of this information.

 8         THE COURT:  If it has anything to do with the timing

 9    as to when you're going to get access to all of this

10    information, I guess you better put it out there.

11         MS. HABAS:  Unfortunately, the last mental-health

12    examination of the gun man was not due until tomorrow.

13    Normally, if the evaluator was unable to present it to the

14    court, you would have an extension of time.  No motion for an

15    extension of time has been filed.  We anticipate that that

16    report has been provided or will be provided tomorrow.

17         Right now, we have a December 8 setting for first

18    appearance of jurors.  They have a trial readiness conference

19    scheduled for November 1.  I am still having some difficulty

20    believing that it will begin on December 8.  I know

21    Judge Samour is very, very much wanting to go forward on

22    December 8.  But until we know what happens in that

23    mental-health evaluation, we can't be certain.

24         So as of right now, we're set for December 8 trial for

25    jury selection.  Testimony would not begin in all likelihood

1  until at least February of 2015.  They're doing individual *voir*

2  *dire*.

3       THE COURT:  And from what I read in the paper, to

4  quote a famous person, such as Mr. Taylor, they're calling in a

5  number of jurors that is beyond anything --

6       MS. HABAS:  6,000, Your Honor.

7       THE COURT:  -- I can even conceive.

8       MS. HABAS:  6,000.

9       THE COURT:  I can't even conceive of it.

10      MR. TAYLOR:  And we also independently feel that the

11  December 8 start date is likely not to occur.  For a variety of

12  reasons.

13      THE COURT:  Well, that's beyond what I can predict.

14      All right.

15      I want to do the best I can to keep this case moving

16  forward.  This is already one of my older cases.  That is not

17  anyone's fault.  It is just a fact.  And I'm going to give you

18  a new trial date.  It's possible that that date itself may --

19      MS. HABAS:  Your Honor, may I use my cellphone, which

20  is my calendar.

21      THE COURT:  Of course.

22      MS. HABAS:  Thank you.

23      THE COURT:  But if you had a paper Day-Timer, I would

24  give you extra points.

25      All right.

 1          MR. STRAUSS:  Well, I'm cocounsel, so.

 2          MS. HABAS:  Mr. Strauss will save me.

 3          THE COURT:  He just became lead counsel in the case.

 4          MR. TRIGG:  Way to volunteer.

 5          THE COURT:  How would it work with you to start this

 6    three-week jury trial on either August 17, August 24, or

 7    August 31.

 8          MS. HABAS:  Any of those dates are fine for me, Your

 9    Honor.

10          MR. TASKER:  Me as well, Your Honor; Mr. Tasker.

11          THE COURT:  Defendants.

12          MR. TAYLOR:  May I have just a moment.  Out of an

13    abundance of caution, I didn't just turn the ringer off.  I

14    turned the whole phone off.

15          THE COURT:  Okay.

16          MR. STRAUSS:  Your Honor, I don't know if this will

17    affect anybody but me, but a three-week trial beginning on

18    August 31, would run into the Jewish holiday of Rosh Hashanah.

19          THE COURT:  I just went through that.  I just

20    finished, literally, today, a three-week one-day trial, and we

21    were down on Rosh Hashanah.

22          MR. STRAUSS:  If we started it earlier, it would be

23    fine.

24          MR. TAYLOR:  Your Honor, the 31st works for me.  For

25    the defense.  And it looks like we could start as early as the

 1   24th.  The 17th is problematic.

 2            THE COURT:  Which is the Rosh Hashanah day?

 3            MR. STRAUSS:  Rosh Hashanah is the 14th of September.

 4   So if we started on the 24th, it would not conflict.

 5            THE COURT:  Is that acceptable to everybody, then?

 6            MR. TRIGG:  Yes, Your Honor.

 7            MR. STRAUSS:  Yes, Your Honor.

 8            MR. TASKER:  Yes, Your Honor.

 9            MS. HABAS:  Yes, Your Honor.

10            THE COURT:  August 24 to September 11.

11            MR. TAYLOR:  Your Honor, the only caveat, I would like

12   to be able to run this by my clients just to make sure that no

13   one has a vacation planned.  Some of the senior executives at

14   Cinemark, believe it or not, do plan their vacations quite a

15   bit in advance so they can arrange things.  So I would like to

16   double-check that, but I have no reason to think it would not

17   work.

18            THE COURT:  You have August 31 to September 17, as a

19   backup day, if that helps.

20            MR. TAYLOR:  Thank you.

21            THE COURT:  Now, trial-preparation conference.

22            You've got a final pretrial conference set in

23   December.  And I don't remember if we set that with me or with

24   Judge Hegarty.  December 1 of 2014.  That doesn't make any

25   sense, now, does it.

```
 1              MR. TAYLOR:  No, sir.

 2              MS. HABAS:  No, Your Honor.

 3              THE COURT:  All right.  Let's vacate that.

 4              And instead, we can give you July 23 at nine, July 28

 5    at nine, or July 29 at one-thirty.

 6              July 23, nine; July 28, nine; July 29, one-thirty.

 7              MR. STRAUSS:  All of those are open on my calendar.

 8              MS. HABAS:  Your Honor, I am in trial in Seattle on

 9    the 23d, and that trial will last through the 30th.  And, boy,

10    in fact, it's scheduled to last until August 14, I'm afraid.

11              THE COURT:  You're going to be a tired young woman.

12              MS. HABAS:  Yes, Your Honor, I am.

13              THE COURT:  Okay.  Well, let's get some more dates,

14    then.

15              We'll need at least half a day.

16              THE COURTROOM DEPUTY:  Your Honor, would you like to

17    look before those dates or into August?

18              THE COURT:  Before.

19              THE COURTROOM DEPUTY:  I have Thursday, June 11 at 9

20    a.m.

21              MS. HABAS:  That's acceptable, Your Honor.

22              MR. TASKER:  That's acceptable.

23              MR. TAYLOR:  I'll be in trial, Your Honor, I'm sorry,

24    on June 11.  Would something a little --

25              THE COURT:  Let me explain what's going to happen, and
```

1  you tell me if you think it's critical that you be here.

2  MR. TAYLOR:  Yes, sir.

3  THE COURT:  What's going to happen is we're going to

4  talk about jury instructions, witness list, exhibits, and in

5  *limine* issues other than in *limine* that has to do with

6  qualifications of experts.  Daubert-type situations.  Daubert

7  hearings I think need to be held by themselves.  They're

8  evidentiary in nature.

9  I don't need or frankly want a pretrial order.  In my

10  view, that's just busy work.

11  What I do want, though, is that before a

12  trial-preparation conference, whenever we schedule it, you will

13  have in advance exchanged proposed jury instructions, decide

14  what you can agree on, what you can't agree on, and get all of

15  that over to us.

16  And I will look at it before the conference.

17  Exchange lists of witnesses, exhibits, talk about any

18  problems you think you have with that.  Routine in *limine*

19  things, if there are any, that you can't work out, all of that.

20  I don't need necessarily every lawyer present.  But I respect

21  that lead counsel certainly has a right to be present.

22  MR. TAYLOR:  I appreciate that.  I am lead counsel and

23  I do need to be there, Your Honor.

24  I apologize.  May I ask Miss Habas what date her trial

25  started in July.  Because I'm pretty open in early to mid July,

1  and I'm wondering if we could pick a date that doesn't

2  interfere with her trial prep for that --

3          MS. HABAS:  Begins on July 20.

4          MR. TAYLOR:  Is there something from July 8 through

5  July 19 or something that we might be able to find a date that

6  would work?

7          THE COURT:  That's what we'll do.  We'll set it on

8  July 19, the day before her Seattle trial.  That will show her.

9          MS. HABAS:  Let the record reflect the Court is

10  laughing.  I'm cringing.

11          THE COURT:  Okay.  We'll keep looking for dates for

12  you.

13          THE COURTROOM DEPUTY:  The only thing on those two

14  weeks I have is Friday, July 10, at 9 a.m.

15          MR. TAYLOR:  That would be perfect for us.

16          MS. HABAS:  I could accept that, Your Honor.

17          MR. TASKER:  That will work, Your Honor.

18          MR. STRAUSS:  Yes, Your Honor.

19          THE COURT:  That won't necessarily involve all of you

20  anyway.

21          So July 10 at what time?

22          THE COURTROOM DEPUTY:  9 a.m.

23          THE COURT:  9 a.m.

24          MR. TAYLOR:  You're calling this a trial-preparation

25  conference.

1        THE COURT:  I'll call it whatever you want.  That's

2   what I call it.

3        MR. TAYLOR:  Okay.

4        THE COURT:  Only because that's what I use the

5   conference for, to prepare for trial.

6        MR. TAYLOR:  Right.

7        THE COURT:  All right.  The next question is which

8   case.

9        I suggested to Judge Hegarty before your status

10  conference that it might make sense to pick a case and try a

11  case that elicited the defendants' position.  This paper that

12  Judge Hegarty must have been thinking about, the Pelt case.

13  Judge Hegarty was thinking about what I suggested, nothing

14  more.  Other than his own good sense.  It doesn't seem to me to

15  make any sense with 21 or 22 lawyers on the plaintiffs' side.

16  That's a circus, not a trial.  That is why I suggested that you

17  folks pick a case.

18        Quite frankly, although the damages to the various

19  plaintiffs might be different, the liability issues seem to be

20  much the same.

21        Have you done anything along those lines?

22        MS. HABAS:  I have definitely tried, Your Honor.  The

23  difficulty I'm having is Magistrate Judge Hegarty did make that

24  very clear to us, and there is no fault in how he gave us that

25  information from you.

 1          The difficulty is that it has been impossible for me

 2     to herd all of these cats and to get agreement.  As you might

 3     imagine, different lawyers have different opinions about who

 4     should try that case.  Different lawyers have different

 5     opinions about how it ought to be tried.  And I was hoping

 6     today to learn a bit more about parameters with the Court.

 7          For example, if we cannot get an agreement, if the

 8     Court has an idea of what that first trial will look like.

 9     Perhaps then I can use that information to assist people in

10     making a decision.

11          There are even lawyers that have been involved in this

12     case for some time who have yet to appear for a single

13     conference.  Needless to say, I can't get their agreement if

14     the Court's orders can't even get them to show up in this

15     courtroom.  So I question whether I will be able to get a

16     complete agreement from all counsel.

17          However, Your Honor, if you give us some information

18     about what would happen if we -- in the absence of agreement,

19     perhaps I can use that.

20          THE COURT:  Well, look, I don't want to be the one

21     that chooses.  But this goes back to the very beginning.  We

22     consolidated the cases for pretrial purposes.  And I recall

23     you, Ms. Habas, being rather adamant that you didn't want it

24     consolidated for trial.

25          MS. HABAS:  That's correct.

1        THE COURT:  And we didn't consolidate it for trial.

2   So we have, by my count, 19 separate cases now.  Your Axelrod

3   case happens to have been the first one.  It is because that

4   one was assigned to me randomly that I ended up with all 19.

5        MS. HABAS:  I remember.  Probably not as well as you

6   do.

7        THE COURT:  And in the absence of something more

8   rational, I might just take the top one off the top.

9        MS. HABAS:  I am -- this is not unexpected, Your

10  Honor.  But Magistrate Judge Hegarty obviously would not be

11  able to read your mind as to what you were thinking, and that

12  gives me a certainty issue that I then can go back and gain, I

13  hope, everyone's agreement.

14       THE COURT:  Okay.

15       Do any of the others who happen to be here today on

16  behalf of the various plaintiffs want to weigh in on that, on

17  the record.  Do you want to just continue to talk with

18  Miss Habas and see if you can reach agreement.

19       MR. TASKER:  At this point, Your Honor, I think we

20  would like to consult a little longer.  I think that gives us

21  some idea of what would happen if we don't reach an agreement.

22  I'm fairly confident that we could reach an agreement.

23       Would the Court entertain a two-plaintiff or a

24  three-plaintiff trial, with a two-lawyer trial team?

25       THE COURT:  I wouldn't necessarily be opposed to that.

1          MS. HABAS:  I think what the Court is conveying -- and

2     I want to make sure I understand it -- is you don't want

3     multiple lawyers examining the same witness.  You want a

4     defense examination and plaintiffs' examination, however that's

5     going to look.  Would that be accurate?

6          THE COURT:  Well, that's accurate.  I said that there

7     was 22 lawyers.  That I added up.  That doesn't mean that there

8     are 22 different law firms.  But even just law firms I think I

9     can count, one, two, three, four, five, six, seven, eight,

10    nine, ten, eleven.  Eleven.  Plus or minus one or two.  Eleven

11    different law firms.

12         Now, can you imagine a witness is on the stand and

13    eleven lawyers take their turn.  Just on the plaintiffs' side.

14    It's a circus.

15         MS. HABAS:  The reason I think Mr. Tasker and I are of

16    that same mind in that asking a question is somewhat simple.

17    Obviously we have clients that we need to present alternatives

18    to, this will happen if we do not have an agreement.  And it

19    would assist us if we could pick some representative

20    plaintiffs, and that's why I think it might be important, as

21    long as we understand that the rule is it's going to be one

22    examination per side.

23         THE COURT:  Well, yes.  If you can pick representative

24    plaintiffs.  If you can narrow down the lawyers who actually

25    are going to participate in the trial to, what did you say, two

1    or three, whatever, a small number.  Equivalent to the

2    defendant team, let's say, roughly, I'm okay with that.

3         And probably the defendants, I'm going to guess, I'll

4    talk with them next, would be in favor of that because what

5    they are going to want to do, someday, is argue, assuming that

6    they prevail, that whoever represented the plaintiff was an

7    adequate representative.

8         MS. HABAS:  That was my next question.  Is does the

9    Court envision requesting written agreements by

10   nonparticipating plaintiffs to abide by the liability

11   determination at trial, or are we simply going to have this

12   occur and people can argue whether they are entitled to a new

13   trial or not?  Not sure of the parameters of that.

14        THE COURT:  Well, I know what Mr. Taylor wants.

15        What do you want?

16        MS. HABAS:  Well, what I want is probably the least

17   important thing.  If I'm the one that is tasked with getting

18   the written stipulation of every single lawyer and every single

19   plaintiff, I'll tell you, I don't want that.  Because quite

20   frankly, as I said, I can't even get certain lawyers to show

21   up.

22        And to get them to agree that they're going to abide

23   by a trial that they are not the lawyers on is, frankly, a

24   burden on me that I would rather not have.  There are some

25   people I think we can get a reasonable consensus, and those are

1  likely the people here.  I haven't met the counsel who's on the

2  phone, so I don't know.  But I do think it's kind of a burden

3  for me to have written agreements in advance from everybody

4  when I can't even get them to participate as it is.

5          THE COURT:  Right.  Well, I'm going to assume that you

6  cannot.

7          That doesn't decide the question of possible issue

8  preclusion.

9          MS. HABAS:  True.

10          THE COURT:  Both as a legal matter and a practical

11  matter.

12          As a practical matter, I suspect that whatever happens

13  in the trial will more likely than not dictate the future.  As

14  a legal matter, under the case that Mr. Taylor was so kind to

15  bring to my attention, the Pelt case out of the circuit, there

16  can be issue preclusion even against a nonparty if, among other

17  things, the nonparty is adequately represented by someone with

18  the same interests.  And then it gives a case, the Taylor case

19  from the Supreme Court is where it got the three-part test for

20  that, or it's a two-part test, when the interests of the

21  nonparty and her representative were aligned and, among other

22  things, when the court took care to protect the interests of

23  the nonparty.

24          So as a legal matter, there possibly could be issue

25  preclusion.  As a practical matter, I suspect that one trial

 1   would tell.

 2            MS. HABAS:  We can certainly, if the Court is allowing

 3   us to make decisions about the trial team and things of that

 4   nature, I think certainly as a practical matter for the people

 5   I represent, that's likely.

 6            THE COURT:  All right.

 7            Let's put some parameters on when you are going to

 8   pick your representative case or cases.

 9            Since we're way off into the future, I don't see that

10   that has to be done this week.

11            Suggest a date.

12            What do you want to suggest?

13            MS. HABAS:  30 days, Your Honor.

14            THE COURT:  Mr. Taylor, you've sat there and bided

15   your time.  Do you have anything you want to add?

16            MR. TAYLOR:  We would like to be heard on the issue.

17   If I may ask Mr. Roche to address the issue preclusion, the

18   Pelt case, the written agreements, the universe of things you

19   touched on.

20            THE COURT:  Sure.

21            MR. TAYLOR:  Thank you, Your Honor.

22            THE COURT:  And notice that he has already earned a

23   higher place in the court reporter's list of good guys than you

24   have because he went right to the lectern.

25            MR. ROCHE:  Well, Your Honor, I'm not going to address

1    all of those issues.  What I do want to say is that the

2    defendants have two concerns.

3           Our first concern is that there be one trial and one

4    trial only on liability.  And the Court touched on that issue.

5    What we don't want to have happen is that we have one trial and

6    some plaintiffs or their lawyers lay in the weeds and if the

7    trial goes against plaintiff, a jury enters a verdict for the

8    defendant, then those plaintiffs come in and say, well, we want

9    a second trial.

10          Under the Pelt case, to prevent that from happening,

11   we would suggest that there be an agreement whereby all

12   plaintiffs and all defendants agree to be bound by the

13   liability determinations in the first trial.  That's what we

14   would --

15          THE COURT:  That's a nice suggestion, but it's

16   impractical, because I don't think the plaintiffs will do it.

17          MR. ROCHE:  Now, alternatively, alternatively, Your

18   Honor, we would ask that the plaintiffs who are willing to do

19   it and plaintiffs' lawyers who are willing to do it, enter into

20   such an agreement and then the Court in its order, saying that

21   there will be a one-plaintiff trial or a two-plaintiff trial,

22   also find that these nonparty plaintiffs will be adequately

23   represented by the plaintiffs at trial and by the designated

24   lawyers.

25          In other words, the Court make that finding in

1    advance, that the designated lawyers will in fact adequately

2    represent the interests of the nonparty plaintiffs.  If that is

3    the case, then we would feel sufficiently protected under the

4    Pelt case to not have to go through subsequent liability trials

5    if we are successful at the first trial.

6         THE COURT:  Right.  Mr. Roche, I already said it.  I

7    don't think as a practical matter you'll have to go through any

8    subsequent trials.  But I don't think, as a practical matter as

9    well, that you're going to get an agreement from parties to be

10   bound by what some other party did.  I just don't think that's

11   probably in the cards.  If they want to agree to that, fine.

12        MR. ROCHE:  Well, I think some of the plaintiffs'

13   lawyers would agree to that.  What I'm suggesting is that the

14   Court, to give us the protection of the Pelt case, Court in its

15   order, order a one-plaintiff trial or two-plaintiff trial, have

16   in there a provision that the Court finds that the designated

17   lawyers who will be trying that first case and the plaintiffs

18   who will be in the first case adequately represent the

19   interests of the nonparty plaintiffs in that case.

20        THE COURT:  Tell me how I can make that ruling before

21   I even see what they do?

22        MR. ROCHE:  Well, I think you could -- with all due

23   respect, I think you could find, for example, that Ms. Habas is

24   an adequate representation --

25        THE COURT:  Ms. Habas is a great lawyer.

```
 1            MR. ROCHE:  Right.

 2            THE COURT:  How can I say before I see what she does,

 3   that she's represented nonparties?

 4            MR. ROCHE:  Courts do that all the time.  In

 5   class-action lawsuits, they make decisions before the trial as

 6   to who is the best representative of the plaintiff class.  This

 7   is something that is regularly done.

 8            THE COURT:  Well, this isn't a class action, is it.

 9            MR. ROCHE:  Well, no --

10            THE COURT:  What it is is 19 different lawsuits.  Each

11   separate, each has its own plaintiffs, has its own civil action

12   number.  I'm not going to make an advance determination of

13   that.  But I don't really think you have all that much to worry

14   about, frankly.

15            MR. ROCHE:  Our second concern, Your Honor, is that

16   there is nothing about a one-plaintiff order or a two-plaintiff

17   order so that we're unfairly precluded from presenting

18   favorable evidence in support of our liability defense.

19            THE COURT:  How could that happen?

20            MR. ROCHE:  Well, for example, we would be, as one

21   example, we would be able to present testimony that is

22   developed in discovery from the nonparty plaintiffs that may be

23   favorable to our defense.

24            THE COURT:  All the discovery was consolidated.  You

25   can use any part of the discovery that you want.
```

1          MR. ROCHE:  That's just our second concern we wanted

2     to raise.

3          THE COURT:  Right.

4          You don't have any objection to that, do you?  I don't

5     know how you could.

6          MS. HABAS:  I don't know how I can.  I mean, if

7     there's some specific.

8          If there's some specific information or evidence that

9     defense is concerned about being able to bring in involving a

10    nonparty, I'd have to know what it is.  But it would be

11    difficult, with the Court having consolidated for all discovery

12    purposes, I think it would be difficult for me to object.  But

13    I'm trying to think of a situation where they would need to do

14    that.

15         THE COURT:  Well, unless the defendant can think of

16    one, I can't think of one, either.

17         MR. TAYLOR:  At the conference with Magistrate Hegarty

18    probably, I don't know when that was, six weeks or so ago, if

19    you read the transcript, I raised this exact issue.  I said, I

20    don't know how that looks.  I'm worried about collateral

21    estoppel, I'm worried about *res judicata*, I'm worried about

22    Pelt-type issues, and I want to make sure that if I want to

23    call, for whatever reason, however farfetched it may seem

24    today, a plaintiff who is not an actual party in that trial to

25    testify for the defense, I'm not precluded from doing that.

 1          THE COURT:  You're not.  You're not precluded from

 2   that.

 3          MR. TAYLOR:  Good.

 4          THE COURT:  Absolutely not.

 5          MR. TAYLOR:  The problem is, Your Honor, I feel like

 6   we're in between a rock and a hard place.  Let me, if I may

 7   just share with you my thinking.

 8          Clearly on many levels, I kind of like the idea of two

 9   lawyers from the plaintiff and two plaintiffs and, you know,

10   five or six, seven lawyers in the courtroom total, and we knock

11   it out for a couple weeks and we see what happens.

12          And I don't necessarily wholeheartedly disagree with

13   you, related to your prognostication that as a practical

14   matter, we may not have any further problems if we win, if the

15   defense prevails.

16          But let me tell you what keeps me up at night about

17   that scenario.  There are some very good lawyers in this

18   courtroom and some others who aren't in the courtroom who

19   represent plaintiffs not at trial.  They'll see exactly what I

20   do in *voir dire*, what my witnesses testify to, my

21   cross-examination, they're going to see exactly how I

22   cross-examine the plaintiffs' witnesses.  They're going to see

23   exactly how I close.  They're going to see exactly how I deal

24   with all type and manner and every single issue that comes up

25   in the case.

 1              And if I, for example, am one of those plaintiffs'

 2      lawyers, like our good friend who is cocounsel with

 3      Mr. Silverman, who represents Mr. Moton who is a quadriplegic,

 4      who is very seriously injured, who probably at the end of the

 5      day will muster a ten, $20 million life-care plan, I don't want

 6      to self-prophesize, but let me tell you, it will be a large

 7      life-care plan.  The young man is 22, 23.

 8              So if I watch that trial and they lose and I think I

 9      could escape issue preclusion and get back after Cinemark with

10      another jury, having learned all the bullets that Taylor shot

11      in the first trial, you bet I'm going to.  Because I don't have

12      a guy who broke his ankle escaping the theater, bumped his head

13      on a seat, broke his arm, I've got a 15 to $20 million, and

14      there's no way I'm going to sit down and let that go, and

15      re-argue if Tina Habas, *et al.* loses.  And my clients are going

16      to be in the suit.

17              So the rock is I either go with that scenario and

18      wonder exactly what these other good lawyers are learning when

19      I put on my best and brightest when I win the first trial and

20      wait till the first trial; or I say to you, don't make this

21      order, make it a circus, bring them all comers, let me try it

22      once, have all comers in here, and let me get my issue

23      preclusion.

24              We don't have to argue about <u>Pelt</u>, we don't have to

25      worry about stretching or making new law on the law.  I know

1    it's issue preclusion, but Stefan Moton sat in his wheelchair

2    in this courtroom.  So I'm between a rock and a hard place; I

3    totally understand what you're saying about the unwieldy

4    nature, but I can't go back to my client and say, the good news

5    is the Judge thinks as a practical matter we won't have any

6    more trials and we'll probably do pretty good in the first one,

7    but we may end up trying as many as four, five, six other ones,

8    just in federal court and that's a matter of time, judicial

9    economy and expense that's outrageous from the defense side.

10   From the plaintiffs' side, that's great.  For me, I've got to

11   put that same case on multiple times.  And I don't think that's

12   fair.

13        So I know where you're coming from.  I know what

14   you've said.  I'm not trying to turn the tide *per se*; I'm just

15   letting you know, there's some real practical concerns on my

16   part, and until we get this <u>Pelt</u> case issue, this virtual

17   issue, issue-preclusion issue nailed down, I can't agree yet to

18   a, to this plan to just have one or two.  You may order it and

19   I may have to go along with it, I understand that.  But I can't

20   agree to it voluntarily.

21        That's why we pushed so hard; we know we can't coerce

22   these folks to come up with agreements.  We'd like to, we'd

23   like the Court to say, you better do it.  You're not in a

24   position to do that.  You can't do it.  I understand as a

25   practical matter.

 1          However, I do think under the Pelt case and its

 2     precedence, you can make a finding that the group trying the

 3     case adequately represent.  And let's have a hearing on it.

 4     And if the lawyers for Stefan Moton want to stand up and say,

 5     we don't think Tina Habas is going to do a good job, or Tom

 6     Tasker, let's have it out.  If you decide that you can't in

 7     good faith and good conscience in advance order that, a finding

 8     per the Pelt case, which I submit, as Mr. Roche said, is

 9     analogous to a class action or anytime a court finds that a

10     representative is an appropriate representative, and that's

11     what that case stands for, you can do that before the fact, I

12     believe.

13          So if we can't do that before the fact, then let's

14     revisit it, as unwieldy as it is, a live trial with, I think

15     there's 13 cases, not 19.  I think there's 13 separate filings.

16          MR. SEEDORF:  20.

17          MR. TAYLOR:  I misspoke.  20.  You said 19.  I think

18     there's 20 separate cases.

19          THE COURT:  I counted 19.

20          MR. TAYLOR:  But regardless, let's get it all done.

21     The courtroom is ample, we can make room.  The defense team

22     will include a couple other folks, paralegals and whatnot, we

23     won't take up very much room.  We can share part of our table.

24     I just don't want to try this case multiple times.  That's a

25     death of a thousand cuts, whether we keep winning or not.  And

1    that's not fair to my client.

2          That's my thought.  So thank you for letting me talk.

3          THE COURT:  Thank you.  I understand.  I understand

4    completely.  I would make the same argument if I were in your

5    shoes.  But in my view, the practical nonsense of having that

6    many lawyers, what did I say, eleven law firms, 22 lawyers, 19

7    or maybe even 20 cases, with all those people perched around

8    this courtroom, plus the public interest there will be in this

9    case and the media and so forth, that's getting into a circus.

10   And I don't want it.

11         We have these cases and the Court certainly has it

12   within its power to say, okay, I'm going to take one at a time.

13   In fact, what I'm saying is I want to take one, try it, and see

14   what happens.  I think it's premature for me to make any

15   "adequacy of representation" finding.  However, I said what I

16   have to say about what I think is a practical matter and maybe

17   you'll just have to live with that.

18         MR. TAYLOR:  We will, Your Honor.

19         May I ask one other thing.  Would the Court -- let's

20   say hypothetically, would the Court allow us any input into

21   which cases we tried first?

22         For example, personally, I can think of three or four

23   really bad cases from an economic standpoint.  Okay, Mr. Moton

24   being one of them.  With high potential damages.

25         THE COURT:  Well, let me stop you there, Mr. Taylor.

1           MR. TAYLOR:  Yes, sir.

2           THE COURT:  You share whatever you want to share with

3    plaintiffs' counsel.  But I'm not going to pick the case unless

4    they can't.  As I said in response to Miss Habas's question, if

5    they simply can't, chances are I'll just take the first one,

6    not because it's Miss Habas, because it was the first one.  I

7    would rather have them make that choice, and if you want to

8    have input, I'm sure they'll listen to you.

9           MR. TAYLOR:  They always listen.  It's just that they

10   don't always heed, Your Honor.

11          THE COURT:  Well, unfortunately for you, neither do I,

12   apparently.

13          MR. TAYLOR:  Right.  Right.

14          No, I appreciate that.  I'm just trying to think of

15   ways that in light of the way the Court's going to do, if, for

16   example, we can say, you know, if there are 19 or 20 cases,

17   maybe we at least do three or four so that we can do three or

18   four at a time so we don't end up with 18 others.

19          THE COURT:  All right.  You've got 30 days to talk

20   with plaintiffs' counsel about that.

21          MR. TAYLOR:  Thank you.

22          THE COURT:  Let's keep going here.

23          Next on my list is size of the jury.

24          MS. HABAS:  Magistrate Judge Hegarty did bring this to

25   our attention, Your Honor.

1        In our view, and I am not certain of this, but I

2   believe, whenever this Court has tried a diversity civil case,

3   this Court has seated six jurors and perhaps an alternate.

4        THE COURT:  Well, that's not right.

5        MS. HABAS:  All right.  And that's why I wasn't

6   certain of that.

7        THE COURT:  It's close, but it's not right.

8        MS. HABAS:  In our view, although this seems to be an

9   enormous case, obviously for public interest and the community,

10  this is still a diversity, premises-liability action.  And

11  without darn good reason, we would ask the Court to consider

12  treating this case and treating these defendants the same as

13  you would treat any other defendant.

14       It is no secret to any trial lawyer who has been in

15  court many times that the more decision makers, the harder it

16  is on the people with the burden of proof.  Magistrate

17  Judge Hegarty even suggested perhaps you were considering 12

18  jurors plus alternates on top of that.  I also know that this

19  Court prefers to allow alternates to deliberate, and I go along

20  with that, under normal circumstances.  Because I agree with

21  the Court.

22       But we would strongly urge this Court to treat this

23  case the same way it treats any other case.  Certainly one of

24  the things we're doing is we are trying at the Court's request,

25  which is reasonable, to come up with a plaintiffs' team that we

1    can avoid going to trial 19 different times.  I think it would

2    be improper and unfair if we put ourselves in a more difficult

3    position than any other plaintiff in a premises-liability case

4    in this court.

5           So for that reason, we urge you -- now, there may be

6    the necessity for two alternates as opposed to one, given the

7    length of the trial.  I don't know how many were seated in the

8    recent case.  But we, we strongly feel that the Court should

9    treat this the same as other civil cases, Your Honor.

10          THE COURT:  Right.

11          Thank you, Ms. Habas.

12          Mr. Taylor.

13          MR. TAYLOR:  Thank you, Your Honor.  As I shared with

14   Magistrate Hegarty, we would like 12 jurors.

15          THE COURT:  You'd rather have 24, let's say.

16          MR. TAYLOR:  The more the merrier.

17          THE COURT:  And for them, the fewer the better.

18          MR. TAYLOR:  You know, they say that.  I don't know

19   that -- I've never seen a statistic on that.  I know many

20   venues that have a 12-person jury have gone to a plurality.

21          THE COURT:  California does.

22          MR. TAYLOR:  Others have ten two, California is nine

23   to three.  I think 12-person juries.  I tried a bunch of

24   felonies as a prosecutor in Denver, I think that's what I grew

25   up with and am used to.  I think that's appropriate in this

1    case.

2              THE COURT:  All right.

3              MR. TAYLOR:  Thank you.

4              THE COURT:  What Ms. Habas said was somewhat close to

5    true.  I have typically used, in civil cases, juries of seven.

6    I have not, for many years, going way back, ever, maybe never

7    actually, picked an alternate in a civil case.  Matter of fact,

8    I can probably count on one hand the number of times that I

9    ever picked an alternate even in a criminal case.  And the

10   lawyers sometimes winced at that because I would have a two- to

11   three-week murder trial starting and pick 12.

12             Never once in probably 250 trials have I ever had a

13   mistrial because we fell under the number.  That doesn't mean

14   it couldn't happen.

15             In this court -- and by this court, I mean the

16   district of Colorado, not just this judge -- there are a number

17   of different practices in civil cases.  In criminal cases,

18   everyone agrees, there have to be 12.  And I think some of the

19   judges, maybe all of the judges, when they try a criminal case,

20   depending on what it is and how long it's supposed to last, and

21   so forth, might pick an alternate or two, whatever.  But in

22   civil cases, there are judges in this district who routinely

23   use juries of 12 and whom I believe, believe that that is the

24   way it has to be done, or the way at least it should be done,

25   that anything fewer than 12 is wrong.

1          However, that is not the uniform view.  There, I

2     believe, are judges who do juries of nine.  There's at least

3     one that does juries of eight.  I am the only one, I think,

4     that does typically juries of seven.  But that means seven with

5     no alternates.  My thinking always being that you have to have

6     six and if one drops out, then you'll still have six.

7          I came to that view, in part, based on an experience I

8     had early on in the days when I was a trial judge in Denver --

9     or in Jeffco, I mean.  I happened to go on a bicycle trip

10    in . . . somewhere, I can't remember where it was, somewhere

11    outside of the United States.  You know, the kind that's put on

12    by Back Roads or one of those type of companies.  And there

13    just so happened, coincidentally, to be another couple from

14    Colorado, happened to be from Vail.  And the fellow was a

15    proprietor of a little business in Vail.  And he had recently

16    had an experience which he was quick to tell me all about as

17    soon as it was discovered when we all introduced each other at

18    the first dinner what my occupation was.  About his experience

19    as a juror in a case, civil case in Vail.  And they had tried

20    this case for two weeks or something.  And then right when it

21    came time for deliberations, the judge had said, well, I'm

22    sorry to tell you that one of you is an alternate and that is

23    you, Mr. X, and thank you for your service, but now you're

24    excused.

25         And he was livid.  To the point that he complained to

1   the judge, that he complained to the state judicial

2   administration.  He complained to the mayor.  He complained to

3   his local state representatives and so forth.  And his feeling

4   was that it was just so unfair to him to have to sit through

5   all that and then be told, well, you can go home.  And that

6   struck a chord with me.

7          Also, I knew that there were different ways of picking

8   alternates that different judges did.  Some would disclose

9   right up front who the alternate was.  Some wouldn't tell the

10  jurors that there was an alternate.  Some would pick a seat,

11  maybe randomly, and whoever ended up in that seat would be the

12  alternate.  You've seen all those methods.

13         So I devised a method for criminal cases, and that

14  was, okay -- I remember this very first murder case I tried,

15  they wanted two alternates, and I said, okay, if you'll agree

16  that nobody is the alternate, and when we get to the end, if

17  there are still 14 sitting there, the bailiff will draw two

18  names at random out of a hat.  In my view, that was the most

19  humane way to do it.  And both sides agreed to that.  If they

20  didn't both agree, I don't think I probably could have done

21  that.

22         So it came time at the end of this trial, and they

23  were all 14 still there, and before we drew names out of the

24  hat, the jurors asked, one of the jurors asked on behalf of the

25  group whether they could make the choice themselves.  Which I

1    said no.  We drew two names, and then you should have seen what

2    took place.  There were tears.  There were hugs.  There were

3    good-byes, all right in front of me, very emotional.  And I

4    think then and there, I decided I was going to try to avoid

5    that for the rest of the time I sat on the bench.

6          All right.  Bringing that back to the civil case.  It

7    is for all those reasons and the fact that you only need six to

8    have a legal jury that I see no reason at all to have an

9    alternate.  We don't need an alternate.  We only need an

10   alternate if we think that we're going to fall under the

11   minimum number and as long as you pick enough, you're not going

12   to fall under the minimum number.

13         Then the question becomes, what is the right number.

14   I told Judge Hegarty, and I tell you now, that my inclination

15   is to think that the right number in this case is 12.  The

16   reason is that this case, more than any other case I've ever

17   had, calls for an expression of the conscience of the

18   community.  My orders in this case have, unsuccessfully in some

19   quarters, tried to explain that I am not suggesting who should

20   or who will win this case.  If anything, I've been fairly

21   candid in saying that I think that the plaintiffs have a very

22   tough case here.  But I also concluded as a matter of law that

23   it was a question of fact that a jury should decide.  But it's

24   a very difficult question of fact.

25         Everybody that's going to be on the jury has gone into

1  movie theaters, before and after this event, probably.

2  Everybody, I suspect, who ends up on this jury, is going to

3  know about this incident.  This is not a case where you can

4  screen out people that have ever heard about this incident.  I

5  suspect this is not a case where you can screen out everybody

6  who may have even formed some preliminary view of this case.

7  But it's a case where we need to have 12 citizens or some

8  number of citizens who represent the community, who are willing

9  to tell us all, in a way that we believe it, that they will

10 keep an open mind and make a fair and proper decision.

11        I think we get a better reflection of the community

12 with more people.  So that's why I'm inclined to a jury of 12,

13 no alternates.

14        Next.  Length of trial.  Three weeks.  We've already

15 decided that, right?

16        MS. HABAS:  Yes, Your Honor.

17        THE COURT:  Next, liability only.

18        MR. TAYLOR:  If I may just address the trial length.

19 I, as I stand here today, never having talked to a police

20 detective in charge of the investigation, never having talked

21 to --

22        THE COURT:  I think I know what you're going to say.

23 I think I can put your mind at ease.  If what you're going to

24 say is I want to be sure that on behalf of my clients, we don't

25 get squeezed in time, the answer is it will not happen with me.

1    Three weeks is what I would expect this case to try.  In fact,

2    I would expect it to take less time than that.  But I'm not

3    going to do a chess clock, and I'm not going to declare a

4    mistrial, if we're not within three weeks.  If you need a

5    fourth week, you'll get it.  If you need a fifth and sixth

6    week, you will get it.

7           MR. TAYLOR:  You're right on for reading my mind.

8    Thank you.

9           THE COURT:  This is a case where everybody -- and I

10   say this in every case I try -- everybody is going to get the

11   time they need.  That doesn't necessarily mean that everybody

12   can go on and on and on *ad infinitum.*  When it gets too

13   repetitious and too boring, I'll say something for sure.

14          Ms. Habas, I suspect, will second what I am about to

15   say.  I've met with almost every jury that I have tried,

16   including the one today.  Either without exception or with

17   almost no exceptions, they always talk about repetition.  At

18   one point early on in the trial, I said -- the one I just

19   finished -- I said to one of the lawyers, I said, There's a

20   horse lying on the floor.  I think it's dead.  But you're

21   beating it.  One of the jurors said to me, that was the

22   greatest thing they heard in the whole trial from the judge.

23   Which kind of puts the rest of what I said during the trial in

24   perspective, I suppose.

25          But the point is the repetition, the repetition, the

1   repetition, and so if it gets too repetitive, I'll say

2   something.  But I'm not going to deprive you of your right,

3   either side, to try your case.

4         Dispositive motions.  We're done with that.  We're

5   done with that.  You've had your chance.  You filed your

6   dispositive motions.  The deadline is past.  We're done with

7   that.

8         Discovery, you've had an awful lot of discovery

9   already.  You're going to have more.  You haven't had any real

10  disputes, right?  Nothing you couldn't work out.

11        MS. HABAS:  I think we did actually an admirable job.

12  I think there may be some issues, but Mr. Taylor and

13  Mr. Seedorf have always wanted to sit down, and we've tried

14  very hard not to burden the Court with discovery issues.

15        MR. TAYLOR:  And I would add, to the extent we've had

16  discovery issues, Your Honor, Magistrate Hegarty has made it

17  very clear we need only call his chambers and speak with him

18  informally, or set up a hearing in short order and he'll gladly

19  hear from us.  So I second, if there are, they can be addressed

20  with you very civilly.  It would be an agreement to disagree

21  and not be particularly nasty.

22        THE COURT:  As you've already discovered, and probably

23  knew anyway, you've got the perfect magistrate judge to help

24  you with that, if need be.

25        MS. HABAS:  We do.

1          THE COURT:  Expert disclosures.  Do we need to put a

2    date on that?

3          And discovery, do we need to put a date on that.

4          MS. HABAS:  Starting with expert disclosures, Your

5    Honor, one of the difficulties is going to be, are these

6    contemporaneous disclosures as the federal rules contemplate.

7    There are certain issues that both sides will have experts.

8    Security is the main one.  It would be our view that there

9    should be contemporaneous expert disclosures on those.

10         THE COURT:  And contemporaneous rebuttal experts.

11         MS. HABAS:  Yes.

12         THE COURT:  Mr. Taylor.

13         MR. TAYLOR:  I always disagree with that.  They have

14   the burden of proof.  I presumably can play tic tac toe the

15   entire trial and not have to designate an expert or anybody,

16   and until I see what their experts say or who their experts

17   are, I shouldn't have to designate my own.  I don't need 45

18   days or 60 days, but 20 or 30 days after they designate their

19   experts would be appropriate for us to cross-designate any

20   experts we have.

21         THE COURT:  Well, I just learned something that I

22   didn't know before and that is that the federal rules prescribe

23   how it's supposed to be done.

24         MS. HABAS:  Yes, they do, Your Honor.  They

25   contemplate contemporaneous.

 1              THE COURT:  Is that true?  I didn't know that.

 2              MS. HABAS:  I just had a meeting on another case in,

 3    where we were discussing this very thing.

 4              MR. TAYLOR:  I'm sorry, I don't know that.  I think

 5    it's subject to a scheduling order, and I don't know if we say

 6    that the federal rules contemplate it, that that means that

 7    there's a rule on point.  I don't know that there's a rule on

 8    point.

 9              THE COURT:  What did we order in this very case?

10              MR. TAYLOR:  We had the plaintiffs go first and the

11    defendants go second.

12              MS. HABAS:  I think we did.  Your Honor, I think we

13    did that.

14              Your Honor, there's one other issue on this --

15              THE COURT:  Which rule was it, Miss Habas, that you're

16    talking about.

17              MS. HABAS:  Oh, boy.

18              THE COURT:  Because I get in enough trouble with the

19    Tenth Circuit without actually violating a rule.

20              MS. HABAS:  Certainly as a matter of custom, I

21    absolutely admit that most of the cases that I've been involved

22    in, it has been staggered disclosures, as a matter of custom in

23    this district.  That's certainly true.

24              Now, there is one other issue on it, Your Honor, and

25    that is certain things that Mr. Taylor does bear the burden of

1   proof on.  For example, his designation of Dr. Fenton as a

2   nonparty.  I don't think he gets to lay in the weeds until I

3   identify expert witnesses to things I bear the burden of proof

4   on and he doesn't.  So that's a complicated factor here as

5   well.

6          THE COURT:  Well, here's what I think the rule says,

7   and unless there's some other rule.  And the rule just -- so

8   that you know what I'm reading from, it's Rule 26(a)(2)(D).

9          MS. HABAS:  Mr. Strauss knew it, Your Honor; I should

10  have asked him.

11         THE COURT:  And it says a party must make these

12  disclosures at the times and in the sequence that the court

13  orders.  Absent a stipulation or a court order, disclosures

14  must be made at least 90 days before the date set for the trial

15  or for the case to be ready for trial.  And then if the

16  evidence is intended solely to contradict or rebut, within 30

17  days after the other party's disclosure.

18         So what it says is it's up to the Court's discretion,

19  and we already exercised that discretion when we set the

20  initial schedule.  So we'll have the plaintiff disclose and

21  then 30 days later, the defendant disclose.  And then a certain

22  number of days later, the plaintiff disclose.

23         MR. TAYLOR:  May I just throw out a date to see if

24  it's agreeable to everyone, or did you have a date in mind,

25  Your Honor?

1           THE COURT:  No, Mr. Taylor, go right ahead.

2           MR. TAYLOR:  Okay.  I was going to say maybe May 1,

3    April 1, something to give us time to get through the criminal

4    case, assuming it goes on December 8, get some other discovery

5    done, get our experts the information they need, and then

6    disclose them sometime in that time frame.  I'm just trying to

7    think what might be logical.

8           THE COURT:  Miss Habas, Mr. Tasker, you seem to have

9    an opinion on this.

10          MS. HABAS:  Well, April is way too early.  I think

11   that is beyond optimistic about the criminal trial and when

12   we're going to be able to get information.  What I don't want

13   to do is come back in and ask for an extension because the

14   criminal doesn't start on time.  The later we can make it, the

15   better.

16          MR. TAYLOR:  Well, the problem is, if we, as I

17   interpret the rule that you read, 26(a)(2)(D), if nothing else,

18   it's got to be 90 days before trial in a staggered manner, and

19   if we back it up 90 days, July, June, we're already at May 15.

20   So that's kind of the last day it could be, something like

21   May 15, May 24, whatever the date could be.  So that's why I

22   said May 1.

23          But I'm not trying to pick a fight.  If she doesn't

24   want to do April, that's fine, we could do May 1, May 15.

25   Whatever.  Just sometime a little earlier than closer.

 1          MS. HABAS:  I've said what I needed to say, Your

 2     Honor.  This is your court.

 3          THE COURT:  All right.  Thank you.  We will say that

 4     the plaintiffs' expert disclosures will be due on May 15.  The

 5     defendant's expert disclosures will be due on June 15.  And if

 6     there are really rebuttal -- and I mean rebuttal -- experts

 7     from the plaintiff, they'll be due on July 29.

 8          All right.  Given that that is your expert disclosure,

 9     when do you want to put an end date on your discovery?

10          MR. TASKER:  Your Honor, if I might.

11          THE COURT:  Because that potentially has you doing

12     discovery fairly close to trial.

13          MR. TASKER:  The disclosure of the defense expert

14     opinions that are on issues that they bear the burden of proof,

15     for example, nonparty liability, and I expect to have extensive

16     opinions from them on the liability of the psychiatrist

17     involved, the way this is set up, we're only getting two weeks

18     to get a rebuttal opinion.

19          THE COURT:  What do you want, Mr. Tasker?

20          MR. TASKER:  What I'm asking for is all of the defense

21     expert opinions that bear on an issue they have the burden of

22     proof are due May 15.

23          THE COURT:  All right.

24          Mr. Taylor.

25          MR. TAYLOR:  We're happy with the way it is, Your

1    Honor.  But that doesn't strike me as unfair.

2           THE COURT:  So the issues you have the burden of proof

3    on are to prove the liability of nonparties; is that right?

4           MR. TAYLOR:  Yes.  And the rub with that is, the

5    nonparties are Mr. Holmes, you know, that kind of goes to

6    everything, right?  So that's why I thought the staggered part

7    was more fair to the defense.  And I prefer to leave it the way

8    it is.

9           THE COURT:  You know, it's kind of interesting because

10   a supreme court, district court, and I believe also the court

11   of appeals at one point held that nonparty liability isn't

12   relevant under the products-liability statute.  But the Supreme

13   Court disagreed.

14          It doesn't seem to me that the issue is Mr. Holmes,

15   really.  You've already presented enough information so far to

16   show that Mr. Holmes was the cause of this and in the sense

17   that he's the one that planned it and carried it out and did

18   the shooting; and in the criminal case, they're not even

19   disputing that anymore, right?

20          MS. HABAS:  Well, they have an affirmative defense,

21   that's correct.  They have an excuse.

22          But, Your Honor, our biggest concern is with

23   Dr. Fenton and the University of Colorado.  And frankly, I

24   wonder how they were able to get a certificate of review when

25   the underlying court made everything privileged.  So that's an

1   issue --

2          THE COURT:  That's something that neither you nor I

3   will ever know.

4          MS. HABAS:  That's true.

5          THE COURT:  What if we do, what if we say with respect

6   to Dr. Fenton and the University of Colorado, the defendant's

7   disclosure date likewise will be the 15th of May.

8          MS. HABAS:  That's acceptable to the plaintiffs, Your

9   Honor.

10         THE COURT:  That gives a certain degree of fairness.

11         MR. TAYLOR:  I agree, Your Honor.

12         THE COURT:  And then the plaintiffs will have until

13  June 15 to disclose their experts that have to do with that

14  subject.  And then the plaintiff will have -- the plaintiff --

15  that many days and the defendant will have the June 29 date for

16  their rebuttal experts on that subject.  So it will be the same

17  three dates.  It's just that the dates will apply to all

18  experts except the experts having to do with the potential

19  liability of Fenton and the University of Colorado in which the

20  schedule will be reversed.

21         Okay.

22         Discovery cutoff.

23         What do you want, folks?

24         Honestly, it doesn't matter to me.  It's really for

25  your benefit.

1          MR. TAYLOR:  I would say, you know, something like

2    August 1.  And then if -- and I'm just telling you right now,

3    if one or the other of us has a legitimate, good-faith problem

4    with that, we'll come to you with a stip to extend a day or two

5    or whatever we need to do.  But I think we can, the defense

6    could live with August 1, Your Honor.

7          MS. HABAS:  We can as well, I believe.  I'm not

8    hearing anybody say anything.  So we can live with that, Your

9    Honor.

10         THE COURT:  All right.  August 1 is a Saturday.  Let's

11   say July 31.

12         All right.  That's my list.

13         Judge Hegarty, do you ever anything else on your list?

14         MAGISTRATE JUDGE HEGARTY:  Just some notes I made.

15   Yeah, since we have a court reporter, we don't have that luxury

16   in the magistrate judges' courtroom, so we don't need a

17   microphone.

18         First of all -- and this is partially to have a

19   conversation with this gentleman right in front of you guys --

20   do any of you even expect to possibly have discovery from the

21   criminal trial anytime before the summer?  Do you

22   realistically.  Do you realistically expect to get any

23   information out of that until midsummer.

24         MR. TAYLOR:  No.

25         MS. HABAS:  No.

 1          THE COURT:  So we are setting up dates that are

 2  impossible if it goes to trial because you're expecting at a

 3  minimum, starting in February, of a four- to six-month trial,

 4  isn't that about right.

 5          MS. HABAS:  Correct.

 6          THE COURT:  So the trial will be getting over about

 7  the time this trial starts, according to the current schedule.

 8          MS. HABAS:  Correct.

 9          MR. TAYLOR:  That's very disheartening when you put it

10  this way.

11          MAGISTRATE JUDGE HEGARTY:  We got to deal with

12  reality.

13          So you might want to think about that, then, Your

14  Honor.

15          One thing I had focused on, in all the proceedings

16  before me, Miss Habas raised that there are some people that

17  have never been here.  At every single setting in court that

18  either Judge Jackson or I had, have all parties had an attorney

19  in court with whom they have an attorney/client relationship?

20          MS. HABAS:  No, Your Honor.

21          MAGISTRATE JUDGE HEGARTY:  How in the world can people

22  expect to skip out on court.  How many plaintiffs are not

23  represented today?  Because it's fundamentally unfair to

24  parties that they don't have an attorney here and we're talking

25  about the very essence of what's going to happen.

1           How many parties are not represented?

2           MS. HABAS:  I believe two suits.

3           THE COURT:  Two lawsuits?

4           MS. HABAS:  I believe so.

5           THE COURT:  In the past, have there been more than

6    that that haven't been present in court?

7           MS. HABAS:  No, and that's primarily because

8    Mr. Malman and I have an agreement of cocounsel on many of his

9    with one exception, and that's Mr. Sullivan.

10          THE COURT:  Right.  And I understand that you all are

11   helping each other out, but you don't have an attorney/client

12   relationship with the parties that aren't represented here.

13          MS. HABAS:  No, Your Honor.

14          MAGISTRATE JUDGE HEGARTY:  That's a real problem in my

15   opinion.  You have to let the people going forward know that if

16   there's a setting in this case, you guys are asking for the

17   same rules to apply, some of you are asking for the same rules

18   to apply that apply in every other case, there is never a

19   proceeding that we should have in open court where there is a

20   party not represented, so that's a problem in my opinion.

21          MS. HABAS:  I believe there were in fact two parties,

22   perhaps more, that didn't even respond to the motion for

23   summary judgment, Your Honor.

24          MAGISTRATE JUDGE HEGARTY:  Yeah.  Well, you know,

25   that's a different matter, because they can just ride the

1    coattails.  But you cannot ride the coattails on an appearance

2    in court.  They have to be here.

3            THE COURT:  Is there anybody here representing case

4    13-cv-114, where the plaintiffs are Johnson and Sweeney?

5            How about in 13-cv-45, where the plaintiff is Spruel?

6            MS. HABAS:  Yes.  That is one of mine, Your Honor.

7    Yes.  I have an agreement with Mr. Davidovich.

8            THE COURT:  Davidovich.

9            MS. HABAS:  Yes.

10           THE COURT:  So you've got Johnson and Sweeney not

11   represented.  You've got who -- 12-cv-2704, Jackson, which is a

12   Malman case.  12-cv-2705, Medek, which is a Malman case.

13           MS. HABAS:  I am here on behalf of Mr. Medek.  I think

14   Mr. Sullivan is the only Malman case that I am not working on.

15           THE COURT:  Are you on Jackson?

16           MS. HABAS:  Yes.

17           THE COURT:  So you've got Sullivan, Johnson, and then

18   anyone on Larimer, Malman --

19           MS. HABAS:  I'm going to have to say I must be, Your

20   Honor.  I am certain Mr. Sullivan is the only Mr. Malman case I

21   am not on.

22           THE COURT:  So there are two cases where there's

23   nobody here.  One is a Malman case, one is a Kaufman case.  But

24   what am I supposed to do about that?

25           MR. TAYLOR:  While I agree with Magistrate Hegarty's

1    observations that that's not in any way acceptable or ideal, I

2    would simply represent to you that they have made the

3    determination that Miss Habas and others adequately and fairly

4    represent their clients and they should be bound by whatever as

5    a result Miss Habas obtains.

6              THE COURT:  Mr. Taylor, you had to get that in.

7              All right.  Go ahead.

8              MAGISTRATE JUDGE HEGARTY:  In choosing your

9    representative plaintiffs, are you going to consider both a

10   death case and an injury case, because if you're going to get a

11   cross section, that would be a fair thing to do in my opinion,

12   but I'll leave it up to you.

13             MS. HABAS:  That is what I was contemplating, Your

14   Honor, and that's why I asked if we could have more than one

15   plaintiff, I wasn't certain.

16             MAGISTRATE JUDGE HEGARTY:  With regard to --

17   Mr. Taylor.

18             MR. TAYLOR:  May I ask a question, Your Honor,

19   Magistrate Hegarty.

20             Why do you say that?  It's a liability-only case.

21   Presumably the jury will not really even know whether someone

22   is a representative -- I mean really won't be a factor at all

23   in the case.

24             MAGISTRATE JUDGE HEGARTY:  Well, you heard

25   Judge Jackson say that he considers this qualitatively

1   different than any other case he's had and this is truly one

2   where he needs somewhat of a representative of the community.

3   I think in all fairness to our side, the press will be covering

4   this, and if those people who actually lost loved ones in that

5   are not somehow, you know, represented in some way at the trial

6   that actually goes, even if liability -- even if liability is

7   the only issue, it's not damages, I think it means something to

8   the public.  And also, you actually do want a cross-sampling.

9   In order to get a cross-sampling, if it goes to trial, you want

10  to cover as many of the various aspects of the case as

11  possible.  So those interests are represented.  It's just

12  different when you have a death and when you have an injury.

13          MR. TAYLOR:  Your Honor, I asked --

14          MAGISTRATE JUDGE HEGARTY:  That's what I'm thinking.

15          MR. TAYLOR:  I asked the question in part so I could

16  get on the soap box and tell you I wholly agree with that, and

17  I would argue that that mitigates in favor of the virtual

18  representation doctrine and for those exact reasons, it would

19  be nice to have a different representative from the class of

20  the folks that were unfortunately killed as a result of this

21  accident and one person from the class of persons that were

22  unfortunately injured as a result of this incident.

23          Thank you.

24          MAGISTRATE JUDGE HEGARTY:  With regard to the

25  remainder of discovery, we know that you'll want documentation

 1   coming out of the criminal trial.  Are you going to need

 2   depositions as well?

 3              MS. HABAS:  Yes, Your Honor.

 4              THE COURT:  And how many new depositions would you

 5   anticipate taking after that case is completed?

 6              MR. TASKER:  Perhaps the best thing to do here is for

 7   the plaintiffs to submit a discovery plan.  I can give the

 8   Court somewhat of an off-the-cuff of who we're looking to

 9   depose.  But I think we can present within ten days, two

10   weeks --

11              MS. HABAS:  Give us the 30 days.

12              MR. TASKER:  30 days, a coherent, overall discovery

13   plan.

14              MAGISTRATE JUDGE HEGARTY:  Right.  Well, I think it's

15   important because obviously scheduling, especially

16   professionals, especially very high-profile professionals, for

17   discovery purposes is somewhat problematic.  Especially if they

18   just participated in a very long trial, the last thing they

19   want to see is a bunch of lawyers.  So the more of that kind of

20   discovery you'll need, not just receipt of documents, the more

21   complicated it gets.

22              Further, the more information you believe you're going

23   to want to provide to the expert, all this has to be done

24   before you even get to the initial round of expert designations

25   because in all fairness to the plaintiffs, because if they need

1   deposition of the doctor who treated Holmes and all these other

2   witnesses, detectives who investigated, then that all needs to

3   be done before you even start preparing your expert report.

4   Then it just feeds into my belief that it would be a miracle to

5   try this case anytime before the end of the year or early next

6   year.

7            THE COURT:  You know, I would say that Judge Hegarty's

8   concern probably will turn out to be the case.  But tell me,

9   why are you thinking that this criminal case is going to take

10  months upon months upon months?

11           MR. TAYLOR:  We're just relying on what Judge Samour

12  has said and has prognosticated himself.  We have no other

13  basis on which to do so.  You sat in state court and tried

14  several high-profile criminal cases.  Obviously this one is a

15  little different.  But, still, it doesn't seem to me that it's

16  a six-month case, but that's what they've slotted for it.  So I

17  don't know what kind of circus is going to prevail there.

18           THE COURT:  I'll frankly believe it when I see it.  I

19  know Carlos Samour pretty well.  He was an associate who worked

20  with me at Holland & Hart years ago.  And I can't imagine that

21  Judge Samour is going to put up with a bunch of nonsense during

22  a trial.  That case is going to be front page news every day.

23  I get the sense that the public as a whole has already had it

24  up to here with that case and the amount of time it's taking

25  and the amount of money that's being spent.  I just can't see

1    the court dragging that case out for months on end.  I mean,

2    it's not even fair to the jurors to do that.

3         MS. HABAS:  I know Mr. Samour well because he appeared

4    my courtroom when he was still with the Denver district

5    attorney's office.  But what I will say is I know he's

6    contemplating individual *voir dire*.  He's bringing in 6,000

7    potential jurors.  Let's assume he only gets 50 percent of

8    those.  That's a whole week just doing questionnaires.  And I

9    believe that Judge Samour believes that *voir dire* is probably

10   going to last three months.  He had everyone pare down their

11   witnesses.  It's my understanding that there's 372 witnesses.

12   That have been identified as pared down.

13        So while I have a tendency to agree with you, Your

14   Honor, I don't know.

15        MR. TAYLOR:  May I go back to something that

16   Magistrate Hegarty brought up, and that is the depositions.

17   I'd like to go back to the original scheduling order, if we

18   may.  I know they're talking about proposing a discovery plan,

19   but I'd like to start with that as kind of a presumed template

20   that we still ought to follow.  None of what we've talked about

21   today is anything we didn't talk about two years ago when we

22   adopted that scheduling order.

23        THE COURT:  What are you talking about?  We've just

24   come up with a schedule.

25        MR. TAYLOR:  No, we're talking about the number of

 1    depositions.  Magistrate Hegarty asked how many depositions are

 2    you going to want.  So I was kind of assuming, Your Honor, Your

 3    Honor Judge Jackson, that we would have that still be in place,

 4    that scheduling order.  And when I hear talk of a discovery

 5    plan, I want to make sure I understand what the playing field

 6    is.

 7              THE COURT:  Is anybody disagreeing with the numbers we

 8    came up with originally?

 9              MR. TAYLOR:  We're not, Your Honor.

10              MS. HABAS:  Well, originally, Your Honor, there were

11    very few plaintiffs here.  I know that the defense appreciated

12    the limits that you set.  I asked you to keep an open mind for

13    some additional depositions.  I think you limited me to ten.

14              THE COURT:  Well, why don't we just stick with the

15    number, and if you need more, you can ask.

16              MS. HABAS:  And that's exactly right.  I just don't

17    see the utility of arguing these issues.  We can have a status

18    conference, I hope, in front of Magistrate Judge Hegarty, if we

19    can't reach an agreement, and that's what we ought to do.

20              THE COURT:  I think that's fine.

21              MR. TASKER:  Perhaps what we could do, I had filed and

22    we tabled a motion for additional discovery.  We can keep that

23    motion tabled, but I can file a motion for the discovery we

24    want, and we can --

25              THE COURT:  You file it when you need it.

1          MR. TASKER:  Okay.

2          THE COURT:  You'll need it only if, A, you need more

3     than what is in that order.

4          MR. TASKER:  Right.

5          THE COURT:  B, Mr. Taylor objects, and you can't work

6     it out, then file it.

7          MR. TASKER:  Understood.

8          THE COURT:  And I'm sure you'll find the bench keeping

9     an open mind.

10          MR. TASKER:  Thank you.

11          MAGISTRATE JUDGE HEGARTY:  Okay.  The last matter I

12     had comes from my role in protecting the district judge who is

13     working on the case, and that is the need to --

14          THE COURT:  You wanted me to recuse?

15          MAGISTRATE JUDGE HEGARTY:  No, and the need to protect

16     him from exposure to a three-year-old case.  So if in fact it's

17     uncertain when this criminal case is going to start and it's

18     certainly uncertain how long it's going to last, it's my belief

19     that the case ought to be administratively closed and then --

20     which, from our perspective, stops the clock.  Then at the time

21     that you reasonably foresee an end coming to the criminal

22     matter, you get back on the radar screen, let us know, and we

23     rev it up again.

24          MR. TAYLOR:  Magistrate Judge Hegarty, we've long been

25     in favor of that; we think it makes the most sense.  We talked

 1    about a stay.  We talked about administrative closure.  The

 2    defense is strongly in favor of administrative closure.

 3    Nothing that prejudices anybody from doing anything at some

 4    point in time.  But puts it on hold.  There's no reason for us

 5    to be taking court time, because I think we're going to have to

 6    revisit nearly all of these deadlines.  I think that's the

 7    smart money, and to put the case on administrative closure, set

 8    a status conference for mid December, when we know if the case

 9    is going to start December 8, would make sense, I think with

10    Magistrate Hegarty.  And if it does start and it seems to be

11    moving with greater alacrity than we anticipated, we can keep

12    the deadlines and go back to work.  But I would suggest that we

13    administratively close it.

14           THE COURT:  Well, look, there's a difference between a

15    stay and administrative closure.  They're two entirely

16    different things.

17           A stay is something where you folks are stayed from

18    doing anything.  Administrative closure is just a court thing.

19    It's just an administrative process within the court.  It

20    doesn't almost even affect you.  The only reason for an

21    administrative closure, I thank the honorable Judge Hegarty for

22    worrying about me, is this business about if our case is over

23    three years old, it has been reported to Washington.  Yes.

24           MS. HABAS:  Don't get any ideas, Your Honor.

25           THE COURT:  If the case is over three years old or if

1    there's a motion that's over six months, et cetera, we have to

2    put that on a list and report ourselves.

3          I'm not quite sure why judges care as much as they do

4    because we've got lifetime employment, but they do care because

5    all of us want to keep our cases moving and provide people with

6    a decision in their case as quickly as we can and not just

7    create some big black hole in this building and all of those

8    things are good.  But I'm not concerned about having your case

9    on my six-month list.

10          Is it on your list, too?

11          MAGISTRATE JUDGE HEGARTY:  No.

12          THE COURT:  Just mine.  So I don't care.

13          But you tell me, if you want in effect voluntarily to

14   stay this case so that nothing happens for the next several

15   months, to me, you'd be wasting your time, frankly.  Time when

16   you maybe can accomplish something.

17          So why stay it?

18          MR. TAYLOR:  Well, you stay it because you don't know

19   what the facts are.  There's, for example, one of the things

20   that -- another thing that keeps me up at night; you may have

21   gathered by now, I don't sleep a lot --

22          THE COURT:  Well, Mr. Taylor, we'll try to calm you

23   down a little bit and get you a little more sleep, a little

24   more comfort.

25          MR. TAYLOR:  I tried some melatonin; that seems to

1    help a little bit.

2           THE COURT:  Okay, that's a start.

3           MR. TAYLOR:  The thing that keeps me up, Your Honor,

4    is this video.  There's a video that the police have had from

5    our premises, I've never seen it.

6           THE COURT:  A video of?

7           MR. TAYLOR:  Of the interior of the theaters.  Of the

8    interior of the lobby.  It's not of the actual theater where

9    the shooting took place.  But it is of the lobby.

10          THE COURT:  Okay.

11          MR. TAYLOR:  And in a premises-liability case, which

12   is exclusively postured as, I'd like to see that video.  I

13   think that's critical.

14          So absent that video, how am I -- another thing, all

15   of my witnesses, all of my employees that were working that

16   night, were taken to Gateway High School with the other 200 or

17   300 or 400 people, and gave statements to the police.  We've

18   never seen those.

19          So on the other hand, sure, we can go forward with

20   discovery and they can take the deposition of employee Jane

21   Smith and John Doe; but on the other hand, I sure would like to

22   have Jane Smith and John Doe looking at the statement they made

23   contemporaneously with the event.  That seems fair and

24   appropriate.

25          THE COURT:  Not to me, necessarily.  They're going to

1   tell the truth in their statement and under oath.

2          MR. TAYLOR:  I don't disagree with that.  But we all

3   know, as a matter of fact, memory changes over time.  That's

4   well documented.  So things like that, Your Honor, to me

5   mitigate in favor of maintaining the status quo until

6   everything is released and the parties can start anew.  I think

7   it's easy to be of two minds.  I'm telling where you I'm coming

8   from.

9          THE COURT:  I hear you.  I think there's a certain

10  amount of self-fulfilling prophesy there.  If you put

11  everything on hold, it's more likely that you're going to need

12  a further extension; and unless we need to do it, I don't want

13  to do it.  I don't have an objection to having a status report

14  in December, a status conference with Judge Hegarty in December

15  if you want one.  But why not, instead of December 1, make it

16  later in the month, because you'll have a better idea of what's

17  actually happening.

18         MR. TAYLOR:  Why don't I get with Miss Habas and the

19  other plaintiffs and we can request a date.

20         THE COURT:  I don't think he can tell you sitting here

21  today what he's got available.

22         MR. TAYLOR:  That's what I meant.

23         MAGISTRATE JUDGE HEGARTY:  They know how to call in.

24         But I'll tell you this.  Go tell your fellow

25  plaintiffs' lawyers that there's going to be an order to show

1  cause in any case where there's not an attorney representing a

2  party.  'Cause they've just got to be there.

3          THE COURT:  You had something scheduled with

4  Judge Hegarty, already, I think on December 1.  That was the

5  final pretrial conference.

6          MR. TAYLOR:  Right.

7          THE COURT:  I'm assuming that's probably on your

8  calendar already.

9          MAGISTRATE JUDGE HEGARTY:  Yeah.  You vacated that.

10          THE COURT:  I did, but we could unvacate it if you

11  want to do that day.  I would suggest later in the month.

12          MR. TAYLOR:  We'll get together and call

13  Judge Hegarty's chambers and get on the calendar.

14          THE COURT:  Anything else.

15          MAGISTRATE JUDGE HEGARTY:  No.

16          THE COURT:  Anything else.

17          MR. TAYLOR:  I would be remiss if I didn't comment on

18  the dispositive motions, they're past.  We limited the

19  discovery in this case specifically to foreseeability issues.

20  They were hamstrung by it, we were hamstrung by it.  There

21  should be no motions on foreseeability.  But on breach,

22  causation, there should be.  We should be allowed, once we

23  explore and take additional discovery, to reopen those.  And I

24  would not ask that you make a ruling on that today; but if I

25  feel the need for that, if the discovery bears it out and I

1    think we have a colorable motion, may I file a motion with the

2    Court to request leave to file one?

3           THE COURT:  Look, a very good lawyer in town suggested

4    to me, not long ago, that a good practice, because I was

5    whining about how many dispositive motions we have to deal with

6    here, that a good practice that some judges, not here,

7    elsewhere, have adopted is not permitting any summary judgment

8    motions at all unless first the party desiring to file such a

9    motion submit a one- or two-page letter to the court explaining

10   why they believe there is no fact dispute and they're entitled

11   or should be entitled to file a motion for summary judgment.

12          I'll leave it this way, Mr. Taylor.  I don't

13   anticipate the need for any additional dispositive motions.  I

14   at least at this point think that we've got fact disputes that

15   will prevent that.  But you may file a one- or two-page letter

16   at some point in the future, after you've had discovery,

17   telling me why you think there's no fact dispute and why you

18   think you're entitled to summary judgment, and I will consider

19   it.

20          MR. TAYLOR:  Thank you very much.

21          THE COURT:  Anything else.

22          MS. HABAS:  No, Your Honor.  Thank you for your time.

23          THE COURT:  Anybody.

24          All you lawyers, anybody have anything else to ask

25   about.

1          It's 20 minutes to six o'clock.

2          Please say thank you to the court reporter and staff

3     for staying.

4        (Recess at 5:39 p.m.)

5                    REPORTER'S CERTIFICATE

6          I certify that the foregoing is a correct transcript

7     from the record of proceedings in the above-entitled matter.

8     Dated at Denver, Colorado, this 14th day of November, 2014.

9

10                         s/Kara Spitler_____
                                   Kara Spitler

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25